In re William O. GENDREAU, Debtor.

William O. GENDREAU, Appellant,

v.

Colleen Rae GENDREAU, Appellee.

BAP No. NV–94–1832–HaMeAs.
Bankruptcy No. 93–31897–JHT.
Adv. No. 93–3119.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Submitted Without Oral Argument
March 22, 1995.

Decided Dec. 14, 1995.

Amended Opinion Jan. 31, 1996.

John R. Martz, Reno, NV, for Appellant.

Peter L. Flangas, Gus Flangas, Las Vegas, NV, for Appellee.

Before HAGAN, MEYERS and ASHLAND, Bankruptcy Judges.

## AMENDED OPINION

MEYERS, Bankruptcy Judge:

### I

Chapter 7 bankruptcy debtor William Gendreau ("Debtor") filed a complaint against his former spouse Colleen Gendreau ("Appellee") for a declaratory judgment that his obligation to pay pension plan benefits to her pursuant to their divorce decree was a dischargeable debt. On opposing motions for summary judgment, the bankruptcy court held that the Appellee's right to a portion of the Debtor's pension benefits was not subject to discharge.

We **AFFIRM.**

### II

### FACTS

The Debtor has been employed by United Airlines, Inc. ("United") since 1966. The

Debtor and the Appellee were married in 1985.

A divorce decree was entered by the Family Court for Loudoun County, Virginia on October 2, 1992. The decree determined that a portion of the Debtor's two pension plans provided by United was marital property, and awarded 50 percent of this marital property to the Appellee. On January 25, 1993, the court entered an order entitled "Qualified Domestic Relations Order" (the "Order"). The Order provided that it was intended to be a qualified domestic relations order ("QDRO") pursuant to 29 U.S.C. § 1056(d). The Order also stated: "This court specifically retains jurisdiction to establish or maintain this Order as a Qualified Domestic Relations Order."

The administrator of the United pension plans was served with a copy of the Order. On May 17, 1993, Scott Zapel, Senior Counsel for the United pension plans, sent a letter to the Appellee stating that the Order was not a QDRO as defined in the statutes. The letter outlined the reasons for this conclusion: (1) the official plans' names were wrong; (2) the Appellee's address appeared to be wrong; and (3) there were two methods for calculating payments due the Appellee, both of which were ambiguous, with no indication as to which method to use if the two methods led to differing results. The letter provided that the Appellee could commence benefits within 60 days after a clarified QDRO was approved by the pension plan administrator.

The Debtor filed a Chapter 7 bankruptcy petition on November 15, 1993. The Appellee had not obtained a clarified QDRO. On November 29, 1993, the Debtor filed a complaint seeking a declaratory judgment that the Appellee's right to payment from the United pension plans was a debt dischargeable in bankruptcy. The Debtor subsequently filed a motion for summary judgment and the Appellee filed a cross-motion for summary judgment.

The bankruptcy court denied the Debtor's motion and granted the Appellee's cross-motion for summary judgment. The Debtor appeals.

## III

### STANDARD OF REVIEW

■ Given that the court granted summary judgment on a legal question of statutory interpretation, and the essential facts are undisputed, we review the court's decision *de novo*. *Matter of Pacific Far East Line, Inc.*, 713 F.2d 476, 478 (9th Cir.1983).

## IV

### DISCUSSION

The issue of whether the Appellee's right to a portion of the Debtor's pension plans benefits is dischargeable centers on whether this right should be characterized as a prepetition claim against the Debtor. 11 U.S.C. § 727(b) states that, except as provided in 11 U.S.C. § 523(a), a discharge under Section 727(a) discharges a debtor from all debts that arose before bankruptcy.[1] The Bankruptcy Code defines a "debt" as a "liability on a claim." 11 U.S.C. § 101(12). Pursuant to 11 U.S.C. § 101(5), a "claim" is defined as:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

Congress intended by the language used in Section 101 to adopt the broadest available definition of the term "claim." *Johnson v. Home State Bank*, 501 U.S. 78, 83, 111 S.Ct. 2150, 2153, 115 L.Ed.2d 66 (1991). We must

1. The parties agree that Section 523(a)(5) would not except the obligation from discharge, as the pension benefit award was not in the nature of maintenance or support. Also, Section 523(a)(15), established by the Bankruptcy Reform Act of 1994, does not apply because this case was filed before the effective date of the Act. Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, 108 Stat. 4106, Sec. 702.

decide whether the Appellee has a dischargeable claim against the Debtor.

## A. *There Was No Claim Against the Debtor*

In *In re Teichman*, 774 F.2d 1395 (9th Cir.1985), a dissolution decree ordered the debtor to pay his former wife a percentage of his retirement benefits. The debtor failed to pay her $14,000 of the benefits he received prepetition and refused to pay her any benefits given to him postpetition. The debtor argued that his obligations to his ex-wife were discharged. The Court of Appeals held that the $14,000 debt owed by the debtor to his wife prepetition was discharged, but that the right to a percentage of the debtor's monthly pension benefits postpetition was not a debt subject to discharge. The court explained that under the dissolution decree, the wife had an ownership interest in a portion of the retirement fund. Since the postpetition payments were not debts under the Code, the court concluded that they were not subject to discharge. 774 F.2d at 1398. The court in *Bush v. Taylor*, 912 F.2d 989, 993 (8th Cir.1990), also held that the former spouse's interest in postpetition pension payments was not dischargeable, for the reasons given in *Teichman*.

In this case, the Appellee is not asking for any monies paid to the Debtor prepetition. In fact, the Debtor did not receive any pension benefits prepetition. Under the rationale in *Teichman* and *Bush*, the right to a portion of these postpetition payments is not a debt owed by the Debtor and therefore not subject to discharge under Section 727(b).

As both *Teichman* and *Bush* involved government pensions, the Employee Retirement Income Security Act of 1974 ("ERISA") did not apply in those cases. The Dissent attempts to distinguish *Teichman* and *Bush* on this basis, and also on the ground that those decisions noted that a property interest had been created in the pension plans prepetition. As explained below, we do not find the distinctions material. The decisions were premised on the fact that payment from the pension was not owed by the Debtor at the time

the bankruptcy petition was filed and therefore there was no debt to discharge. Here, also, the Debtor had no liability to the Appellee. Under the *Teichman* and *Bush* holdings, there was no debt for the Debtor to discharge.[2]

Regardless of when the payments came due, no debt was created because the Appellee did not have a claim against the Debtor. We disagree with the Debtor's argument that because the Appellee did not have a QDRO when the bankruptcy petition was filed, the pension funds were the Debtor's property against which the Appellee merely had a claim.

The Debtor points out that the anti-alienation provision in ERISA precludes assignment of the pension benefits to the Appellee unless she has a valid QDRO. *See* 29 U.S.C. § 1056(d)(1) ("[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated"). ERISA's prohibition on the assignment or alienation of pension benefits has been strictly enforced. *Patterson v. Shumate*, 504 U.S. 753, 760, 112 S.Ct. 2242, 2247, 119 L.Ed.2d 519 (1992); *Guidry v. Sheet Metal Workers Pension Fund*, 493 U.S. 365, 372, 110 S.Ct. 680, 685, 107 L.Ed.2d 782 (1990).

A QDRO is an express exception to ERISA's anti-alienation provision. *See* ERISA § 1056(d)(3)(B)(i)(I); *In re Abbata*, 157 B.R. 201, 205 (N.N.Y.1993). Domestic relations orders which are not QDRO's are subject to the anti-assignment provision. 29 U.S.C. § 1056(d)(3)(A); *Ablamis v. Roper*, 937 F.2d 1450, 1454 (9th Cir.1991). 29 U.S.C. § 1056(d)(3)(B)(i) defines a "qualified domestic relations order" as a domestic relations order

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

---

**2.** The Dissent misinterprets our reliance on *Teichman* and *Bush*. We do not cite these cases for the invalid proposition that debts are not subject to discharge if they are contingent or unmatured. Rather, we believe *Teichman* and *Bush* support our determination that a right to pension benefits is not a claim against the debtor.

(II) with respect to which the requirements of subparagraphs (C) and (D) are met. . . .

Subparagraphs (C) and (D), referenced above, specify what details the order must include, such as the name and address of the participant and alternate payee, the amount of benefits to be paid and the method of payment.

The pension plan administrator is charged with the initial responsibility to determine whether an order is a QDRO. *See* 29 U.S.C. § 1056(d)(3)(G). Here, although the Virginia state court originally deemed the order a QDRO, the pension plan administrator did not.[3] The Debtor argues that rather than having a property right in the pension plans, the Appellee had a contingent right to payment, which was a claim as broadly defined in the Bankruptcy Code. Under the Debtor's analysis, his liability on the claim was discharged under 11 U.S.C. § 727(d).

A bankruptcy discharge operates to discharge all debts that were the personal liability of the debtor. 11 U.S.C. § 524; *In re Raiman,* 172 B.R. 933, 936 (9th Cir. BAP 1994). The Debtor incorrectly assumes that he had an unlimited right to all the pension funds, and that the Appellee's purported "contingent right to payment" was from the Debtor, rather than from United's pension plans. This also seems to be the premise relied upon by the Dissent. What the Debtor and the Dissent fail to recognize is that United, not the Debtor, controlled the funds. The Order provides that the amounts awarded to the Appellee by the Order "shall be separately accounted for . . . until the benefits are distributed. . . ." The Order further states: "The benefits awarded by this Order shall not be assigned, pledged, or otherwise transferred, voluntarily or involuntarily, before [the Appellee] has received those benefits."

Moreover, the ERISA statute itself precluded the Debtor from reaching that part of the pension in dispute. 29 U.S.C. § 1056(d)(3)(H)(i) provides that during any period in which the issue of whether an order

is a QDRO is being determined by the plan administrator, by a court of competent jurisdiction or otherwise, the plan administrator shall segregate in a separate account the amounts which would be payable to the alternate payee if the order is determined to be a QDRO. Section 1132(a)(1)(B) and (e)(1) of the ERISA statute provides that a beneficiary may bring a civil action in state or district court to recover pension benefits, enforce her rights or clarify her rights to future benefits under the pension plans.

Here, the family court's order and the ERISA statute expressly limited the Debtor's right to the disputed funds. The plan administrator was to safeguard the disputed pension funds until a determination was made as to whether the Order was a QDRO. The Debtor was not entitled to the funds until such a determination was made. To obtain the pension funds, the Appellee would file a civil court action against the administrator. The Appellee's claim is against United, not the Debtor. Accordingly, there is no claim subject to discharge in bankruptcy.

It is true that under 11 U.S.C. § 541(c)(2), as construed in *Patterson v. Shumate, supra,* a debtor may exclude his interest in an ERISA-qualified pension plan from the property of the bankruptcy estate. Yet the Debtor's interest in the United pension plans was limited under the state court order and the ERISA statute. When a debtor's ultimate right to receive property is measured by or dependent upon orders which would be issued by a state court, the bankruptcy estate is subject to these rights and the bankruptcy filing cannot enlarge them. *In re Keller,* 185 B.R. 796, 799 (9th Cir. BAP 1995). The Bankruptcy Code neither creates nor enhances the property rights a debtor brings into the bankruptcy estate. *In re Braker,* 125 B.R. 798, 801 (9th Cir. BAP 1991). A debtor may not discharge debts against property in which he does not have a legal or equitable interest. *See* 11 U.S.C. § 541(a)(1). In this case, on the petition filing date the Debtor was entitled to only a

---

**3.** We need not decide whether the Order is a QDRO, but see no reason to question the Dissent's thoughtful analysis of the issue.

percentage of the pension funds, with the remaining portion of the pension subject to the Appellee's right to obtain a QDRO. The ERISA statute recognizes this in § 1056(d)(3)(H), by ordering that pension funds be segregated for up to 18 months while the status of an order as a QDRO is being determined and by acknowledging that this process may take longer than 18 months.

■ The Debtor's property right in the pension funds did not increase upon filing the bankruptcy petition. A debtor's interest in property which was divided in a dissolution judgment prepetition is "fixed and limited by the divorce decree." *Matter of Paderewski*, 564 F.2d 1353, 1357 (9th Cir.1977) (Bankruptcy Act case). The debtor "cannot claim title to a greater interest than that awarded" him in the divorce decree. 564 F.2d at 1356–57. "Once dissolution has been accomplished ... the final judgment is res judicata as to the division of property and is binding on the bankruptcy trustee." *In re Keller, supra,* 185 B.R. at 800. In *Keller,* we held that once the family court ordered the debtor's residence sold and retained jurisdiction to approve disbursement of the proceeds, "those proceeds were for all practical purposes held in custodia legis by that court." *Id.* As such, the Panel deemed the proceeds "beyond the reach of the debtor" and "not part of the bankruptcy estate." *Id.* Here, at the time the Debtor filed his bankruptcy petition, the pension proceeds were, according to both the ERISA procedures and the Virginia family court's order, beyond the reach of the Debtor.

In sum, the Debtor argues that the ERISA statute abrogates the Appellee's interest in the pension plans awarded under state court order because the Appellee did not have a QDRO on the date the Debtor filed for bankruptcy relief. Because ERISA anticipates that entry of a QDRO may be a time-consuming process and provides for segregation of funds during the first 18 months of that process, we do not believe Congress ever meant to allow a pensioner to bypass that process and essentially nullify a state court order by filing a bankruptcy petition. The ERISA statute respects state court orders.

We will not, in the guise of complying with ERISA, invalidate the Order.

## B. *Other Decisions Have Rejected the Debtor's Argument*

The two reported decisions concerning a bankruptcy petition filed before entry of a QDRO have rejected the argument that the right to receive a QDRO was a claim against the debtor subject to discharge. Like the instant case, *In re Long,* 148 B.R. 904 (Bankr.W.D.Mo.1992), involved a domestic relations order which did not meet all the technical requirements of a QDRO. The court found a property right created in the decree of dissolution, namely the right to obtain a QDRO and transfer legal ownership of a portion of the debtor's pensions. 148 B.R. at 908. The court held that the right to secure a QDRO was fixed when the divorce decree became final, and could not be discharged as a debt. *Id.* The court explained that entry of the QDRO would not alter the amount of marital property awarded or otherwise affect the finality of judgment. The court concluded that because there was no debtor-creditor relationship between the parties arising from the property settlement, entry of a QDRO was more akin to enforcement of a property right than to collection of a prepetition debt. 148 B.R. at 907–08.

The other decision adopting this view is *In re Brown,* 168 B.R. 331 (Bankr.N.D.Ill.1994). In that case, the court held that although the debtor's ex-wife had no recognizable legal right under ERISA to the debtor's pension benefits because she was unable to obtain the QDRO prepetition, she did have an equitable interest in the debtor's pensions arising from entry of the decree of dissolution. 168 B.R. at 335–36 n. 6. The court ruled that the former spouse's equitable interest in the pension fund was neither property of the debtor at the time the bankruptcy petition was filed, nor property of the bankruptcy estate. 168 B.R. at 336.

We agree with the above-cited decisions: the right to the pension benefits arose when the divorce decree was entered, and was not, as the Debtor argues, dependent on an order

satisfying the technical requirements detailed by the plan administrator.[4]

### C. *Our Ruling Is Consistent with Congressional Intent*

Construing the Order as awarding a property right rather than a claim is consistent with the legislative history of 29 U.S.C. § 1056. One of Congress's primary purposes in enacting the QDRO exception to ERISA's prohibition on assignment and alienation was to safeguard the financial security of women dependent on their husbands' earnings in the case of divorce or separation. *Ablamis v. Roper, supra,* 937 F.2d at 1453, 1456–57. Congress intended that a former spouse could obtain an enforceable pension interest with a QDRO and presumably realized that processing of the QDRO could be slow. *In re Long, supra,* 148 B.R. at 909. As stated in *Bush v. Taylor, supra,* 912 F.2d at 994: "We doubt that Congress ever intended that a former wife's judicially decreed sole and separate property interest in a pension payable to her former husband should be subservient to the Bankruptcy Code's goal of giving the debtor a fresh start."

■ The purpose of the detailed statutory language in defining QDRO's is to spare ERISA plan administrators who, due to ambiguities as to the identity of the beneficiaries designated in a divorce decree, pay the wrong person and are sued by a rival claimant. *Metropolitan Life Ins. Co. v. Wheaton,* 42 F.3d 1080, 1084 (7th Cir.1994). The Debtor is attempting to misapply the statute to achieve a result Congress certainly never intended: to gain a windfall for himself in contravention of a state court order and at the expense of his former wife.[5] The Appellee's right to receive a portion of the pension funds should not be forfeited merely because the Debtor filed his bankruptcy petition before the right paperwork was submitted. The ruling urged by the Debtor in this case

could encourage other debtors to frustrate a state court's pension award to the former spouse by manipulating the timing of bankruptcy to stay entry of a QDRO. *In re Long, supra,* 148 B.R. at 910. A debtor's attempt to use the bankruptcy discharge as a "sword" to take unfair advantage, rather than as a "shield" to protect him with a fresh start, should not be countenanced. *See In re Pieri,* 86 B.R. 208, 213 (9th Cir. BAP 1988).

### D. *Our Ruling Is in Accord with Non-ERISA Decisions*

Having ruled that ERISA should not be interpreted to let the Debtor discharge the Appellee's right to pension benefits in bankruptcy, we also note that under state law the Debtor could not discharge this right in bankruptcy. Because nonbankruptcy law determines the nature and extent of the debtor's interest in property, *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979), courts have looked at how state law and the divorce decree define the interest in pension benefits. In *In re Chandler,* 805 F.2d 555, 556 (5th Cir.1986), the court recognized that the divorce decree awarded the pension benefits as the former wife's sole and separate property, which was permissible under Texas law. The court held that the portion of the debtor's monthly Army retirement benefits awarded to his former wife pursuant to a divorce decree was not dischargeable as debt because it was the sole property of the debtor's former spouse. Similarly, in *In re Zick,* 123 B.R. 825, 829 (Bankr.E.D.Wis.1990), the court held that "the divorce court did not create an obligation of the husband to the wife as part of a property division that he can now discharge. The court awarded Peggy Zick a portion of the pension fund in her husband's name; it became her property, not his." And in *In re Thomas,* 47 B.R. 27, 33 (Bankr.S.D.Cal.1984) (Meyers, J.), the court found military pension

---

**4.** The Dissent, focusing on the QDRO procedures in ERISA, appears to view these procedures as akin to lien perfection. Under the Dissent's reasoning, until a beneficiary perfects her interest by obtaining a QDRO, she has no recognizable interest in the pension benefits. In contrast, our understanding of ERISA is that it acknowledges the beneficiary's interest in the pension benefits

even before she has complied with the detailed provisions for obtaining a QDRO.

**5.** Because the pension funds are exempt assets, a determination that the right to pension benefits is dischargeable would not increase estate assets for the benefit of creditors.

benefits nondischargeable, for the reason that they were deemed to be the property of the debtor's former wife under California law. *See also In re Brown, supra,* 168 B.R. at 334 (applying Illinois law to find a property right in the debtor's pension).

■■■ In the case at hand, the divorce decree and the Order granted the Appellee a property right in the pension. The Virginia family court directed the pension plan administrator to award the Appellee her portion of the benefits. There was no implication that the Debtor owed money to the Appellee. Furthermore, the plan administrator's assertion that there were technical problems with the Order does not alter the fact that the Appellee was awarded a portion of the pension. Under Virginia law, the substantive terms of a final divorce decree dividing a pension are not subject to modification. *Caudle v. Caudle,* 18 Va.App. 795, 796, 447 S.E.2d 247, 248–49 (1994). A trial court may modify a final decree to effectuate its expressed intent regarding pension benefits, but any adjustment must be consistent with the substantive provisions of the original decree. 18 Va.App. at 798, 447 S.E.2d at 249. Accordingly, under Virginia law the Appellee could ask the state court to modify the Order to comply with the plan administrator's technical requirements. Indeed, the Order reserved jurisdiction for the family court to establish it as a QDRO. The Debtor has not argued that the Appellee is time-barred from either requesting that the Order be modified to alleviate the United plan administrator's concerns, or from bringing suit in state or district court to establish that the Order as it presently reads is a QDRO.

# V

## CONCLUSION

Our reading of the relevant provisions of the Bankruptcy Code and the ERISA statute, along with the legislative history and policy behind their enactment, leads us to conclude that the Appellee's property right in

the pension is not dischargeable, despite any technical deficiencies in the Order.

Because the Debtor did not owe a debt to the Appellee, there was nothing to discharge. The court's summary judgment in favor of the Appellee is **AFFIRMED.**

HAGAN, Bankruptcy Judge, dissenting:

My analysis of the applicable law would mandate a reversal of the order appealed. I therefore respectfully dissent. The order stating that the Appellee had a property interest in the Debtor's pension plan was not a Qualified Domestic Relations Order; it could not create a property interest in the pension plan; and therefore it was a debt discharged in bankruptcy.

### DISCUSSION

*1. The Appellee Could Not Obtain an Interest in the United Pension Plans in the Absence of a QDRO.*

The majority opinion properly notes that the Order did not create a debt that was nondischargeable under section [1] 523 as being "in the nature of alimony, maintenance, or support." 11 U.S.C. § 523(a)(5)(B). The Order constituted a property settlement. "Property settlements ... are dischargeable in bankruptcy." *E.g., Stedman v. Pederson (In re Pederson),* 875 F.2d 781, 784 (9th Cir.1989), *overruled on other grounds, Farrey v. Sanderfoot,* 500 U.S. 291, 111 S.Ct. 1825, 114 L.Ed.2d 337 (1991). In *Pederson,* the Ninth Circuit Court of Appeals relied in part on this provision to permit the debtor to avoid a lien securing a property settlement obtained through a divorce.

> Because the award was not in the nature of alimony, maintenance or support, it would have been dischargeable in bankruptcy under section 523(a)(5). Allowing Pederson to avoid a lien securing such a dischargeable property settlement is thus consistent with Congress's policy "that property settlements should be treated the same as other debts in bankruptcy."

---

1. Unless otherwise noted, all references to "section" are to the respective section of the Bank-

ruptcy Code, Title 11, United States Code.

875 F.2d at 784 (quoting *Boyd v. Robinson,* 741 F.2d 1112, 1116 (8th Cir.1984) (Ross, J., dissenting)).

This case therefore turns upon whether the Appellee has a presently vested property interest in the pension plans, or if her right to obtain such a property interest is a "debt" within the meaning of the Bankruptcy Code. If it is a debt, it will be discharged. 11 U.S.C. § 727(b).

### 2. The ERISA Anti–Alienation Provision.

It is undisputed that the United pension plans are subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub.Law 93–406, 88 Stat. 829, as amended, 29 U.S.C. § 1001 *et seq.* Section 1056 of Title 29, United States Code, provides that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1); *see also* 26 U.S.C. § 401(a)(13)(A). This section is expressly applicable to domestic relations orders:

> Paragraph (1) shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that paragraph (1) shall not apply if the order is determined to be a qualified domestic relations order. Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.

29 U.S.C. § 1056(d)(3)(A); *see also* 26 U.S.C. § 401(a)(13)(B). A "domestic relations order" is defined as:

> any judgment, decree, or order (including approval of a property settlement agreement) which—
> (I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
> (II) is made pursuant to a State domestic relations law (including a community property law).

29 U.S.C. § 1056(d)(3)(B)(ii); *see also* 26 U.S.C. § 414(p)(1)(B). It is undisputed that the Order is a "domestic relations order."

A QDRO is defined by 29 U.S.C. § 1056 in the following manner:

> (i) the term "qualified domestic relations order" means a domestic relations order—
> (I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and
> (II) with respect to which the requirements of subparagraphs (C) and (D) are met[.]

29 U.S.C. § 1056(d)(3)(B)(i); *see also* 26 U.S.C. § 414(p)(1)(A). The plan administrator is charged with initial responsibility for determining whether an order is a QDRO. 29 U.S.C. § 1056(d)(3)(G), (H); 26 U.S.C. § 414(p)(6), (7).

These sections "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). That section goes on to clarify the nature of ERISA's preemption of state law, providing in part that:

> For purposes of this section:
> (1) The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State....
> (2) The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the terms and conditions of employee benefit plans covered by this subchapter.

29 U.S.C. § 1144(c). QDRO's are expressly excepted from preemption. 29 U.S.C. § 1144(b)(7).

### 3. The Order Is Not A QDRO.

The majority opinion correctly concedes that the Order is not a QDRO. As noted, a domestic relations order must meet the requirements of two subparagraphs to be a

QDRO. 29 U.S.C. § 1056(d)(3)(B)(i)(II); *see also* 26 U.S.C. § 414(p)(1)(A)(ii). These subparagraphs provide:

(C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

(D) A domestic relations order meets the requirements of this subparagraph only if such order—

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

29 U.S.C. § 1056(d)(3)(C), (D); *see also* 26 U.S.C. § 414(p)(2), (3).

It is no accident that ERISA requires that the order *"clearly* specif[y]" certain information. 29 U.S.C. § 1056(d)(3)(C) (emphasis

added); *see also* 26 U.S.C. § 414(p)(2) (same).

The statutory language is explicit and emphatic. The purpose is to reduce the expense of ERISA plans by sparing plan administrators the grief they experience when because of uncertainty concerning the identity of the beneficiary they pay the wrong person, or arguably the wrong person, and are sued by a rival claimant. *Metropolitan Life Ins. Co. v. Wheaton,* 42 F.3d 1080, 1084 (7th Cir.1994). "[T]he ... requirement that certain facts be specified clearly serves the purpose of aiding plan administrators in determining whether certain domestic relations orders are covered by the limited exception to the antialienation and preemption rules." *Hawkins v. Commissioner of Internal Revenue,* 102 T.C. 61, 74–75, 1994 WL 26316 (1994). *See also* S.Rep. No. 98–575, 98th Cong., 2d Sess. 19, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2565 (guidelines to determine whether the QDRO exception to the anti-assignment provision applies are "necessary" "[i]n order to provide rational rules for plan administrators".)

"[W]e conclude that a QDRO should be 'clear and specific' and not 'left to determination by inference or conjecture.' To allow otherwise would be to spawn again 'a relentless stream of litigation'." *Hawkins,* 102 T.C. at 73, 1994 WL 26316. Among other things, a QDRO must clearly specify either the amount or percentage of benefits to be paid to the alternate payee, or the method by which that amount or percentage is to be calculated. 29 U.S.C. § 1056(d)(3)(C)(ii); *see also* 26 U.S.C. § 414(p)(2)(B) (same). The terms of the Order by no means met this requirement, for reasons discussed in a footnote.[2]

**2.** The following are some of the more serious ambiguities found in the Order. First, the Order contains two conflicting formulae for computing the benefits to be paid to the Appellee. Paragraph 1 of the Order provides on page 2 that "the Defendant [Appellee] is entitled to one-half of the marital shares, that being 50% of 13.71% of each of the aforesaid properties." Paragraph 2 contains a second formula by which the Appellee's interest is calculated. The denominator is the total number of months of the Debtor's total length of employment until he retires and begins to receive his pension benefits. The numerator

is the total number of months the Appellee and the Debtor were married. This fraction is converted to a percentage, of which the Appellee is entitled to receive one half. The Order does not indicate which formula the plan administrator should use.

This is particularly problematic, since the second formula reaches a significantly different result from the first. Interpreting the second formula according to its most probable meaning gives the following result, based on facts found in the Order. The marital share of the property covers the period from December 3, 1985, to

Despite the concession that the Order does not constitute a QDRO, the majority opinion characterizes the deficiencies in the Order as being "technical" in nature, and even suggests that the requirements were peculiar to the plan administrator. The requirements are not "technical" in the sense of being mere details. They are the defining characteristics of a QDRO, and compliance is mandatory.

### 4. A Domestic Relations Order That Is Not A QDRO Cannot Create A Property Interest In An ERISA–Qualified Pension Plan.

The critical issue, therefore, is whether a domestic relations order that is not a QDRO could nonetheless act to transfer a property interest in an ERISA pension plan. The majority opinion correctly notes that it cannot. In *Ablamis v. Roper*, 937 F.2d 1450 (9th Cir.1991), a husband owned a pension plan in which the wife allegedly had a community property interest. The wife died, leaving her share of the community property to a trust. The question presented was whether a nonparticipant spouse could bequeath an interest in the pension plan.

The Ninth Circuit Court of Appeals held such a transfer was not permitted, as the provisions of ERISA preempted any state law permitting such a transfer. The only possible exception to the anti-alienation provision of 29 U.S.C. § 1056(d)(1) was a QDRO. 937 F.2d at 1454. The Court of Appeals noted that the provisions regarding QDRO's had been added by the Retirement Equity Act of 1984 ("REA"), Pub.Law 98–397, 98 Stat. 1426. 937 F.2d at 1453. After an extensive discussion of the authorities, the court summarized its conclusion as follows:

> Given the specific language of ERISA, the legislative history of REA, and the Supreme Court's clear holdings regarding the applicability of anti-assignment provisions to spousal transfers, we have no doubt whatsoever that § 1056(d) of ERISA is generally applicable to transfers involving spouses and necessarily preempts all orders relating to such transfers that do not fall within the specific and limited QDRO exception set forth in REA. Orders that do not qualify under that exception contravene the direct language of ERISA's anti-assignment provision.

937 F.2d at 1459.

One of the cases relied upon by *Ablamis* is *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990). There, a union official had embezzled funds from the union. The union obtained a constructive trust against

---

August 16, 1990, a total of 57 months. The Order states the Debtor began working at United in August, 1966, and is eligible to retire with benefits on April 1, 1999, a total length of employment of 392 months. If these figures are inserted into the fractional formula, the result is 57/392 or 14.54%. This is significantly higher than the 13.71% figure used in paragraph 1. Differing figures may be obtained depending on how partial months are counted; however, none of these figures equals 13.71%, and the Order does not specify how partial months should be counted.

Other ambiguities exist. As noted, paragraph 1 states that "the Defendant [Appellee] is entitled to one-half of the marital shares, that being 50% of 13.71% of each of the aforesaid properties." This language could be read to say either that the award is of one-half of 13.71% of the plans, or of one-half of 50% of 13.71% of the plans.

The denominator of the second formula in paragraph 2 on page 2 is ambiguous. The Order provides the Appellee may elect to receive benefits as of the earliest date the Debtor could retire. The Debtor has already passed his early retirement date, so pension benefits to the Appellee would be payable immediately. However, the Debtor has not retired. Because the denominator of the second formula is the number of months until the Debtor's retirement, the denominator cannot be calculated. (It should be noted that the record includes the exceptions made by counsel to entry of the Order, and that Debtor's counsel specifically excepted to the Order on precisely this ground.)

Paragraph 1 on page 5 of the Order confuses the situation further. It states the Appellee is awarded "[a] sum equal to fifty percent (50%) of the amount allocated according to the formula described hereinabove." Two ambiguities exist. First, as noted, this paragraph does not specify whether the formula is the percentage described in paragraph 1, or the fractional percentage described in paragraph 2. Second, this paragraph can be read as further halving the sums already halved in both the previous formulae. For example, the second, fractional formula provides that the Appellee is entitled to one-half of the fraction. Paragraph 1 on page 5 would suggest the Appellee was entitled to only one-half of that amount, or one-quarter of the fraction.

the official's pension plan. The Supreme Court held that the constructive trust violated the anti-alienation provision of ERISA. Noting that writs of garnishment against an ERISA pension plan are proscribed by the anti-alienation provision, the Court held: "We see no meaningful distinction between a writ of garnishment and the constructive trust remedy imposed in this case. That remedy is thereby prohibited by § 206(d)(1) [29 U.S.C. § 1056(d)(1) ] unless some exception to the general statutory ban is applicable." 493 U.S. at 372, 110 S.Ct. at 685. The Court held there was no general equitable exception to the anti-alienation provision. 493 U.S. at 376–77, 110 S.Ct. at 687. "Section 206(d) [29 U.S.C. § 1056(d) ] reflects a considered congressional policy choice.... If exceptions to this policy are to be made, it is for Congress to undertake that task." 493 U.S. at 376, 110 S.Ct. at 687 (footnote omitted). The Supreme Court later cited *Guidry* as demonstrating that the Court "vigorously has enforced ERISA's prohibition on the assignment or alienation of pension benefits, declining to recognize any implied exceptions to the broad statutory bar." *Patterson v. Shumate*, 504 U.S. 753, 760, 112 S.Ct. 2242, 2247, 119 L.Ed.2d 519 (1992).

### 5. Summary: The Appellee Had A Claim Against The Debtor That Was Discharged.

In my opinion, this settles the matter. In the divorce, the Appellee had a right to obtain a portion of the Debtor's property. This was a "claim" under section 101(5). The state court attempted to award a property interest in the Debtor's pension plans as part of the property settlement, but it failed to do so. On the petition date, the Appellee's right to obtain a property interest in the Debtor's pension plans was no different from an unsecured judgment creditor's right to levy against a judgment debtor's property. Under section 524, that right was discharged.

The majority opinion reaches a different result, contending that (1) the Debtor's property interest in the pension plans had been limited by the award to the Appellee, and (2) the Appellee's right to a portion of the pension plans was not a "claim." Both of these arguments are flawed.

### 6. Neither The Order Nor ERISA Limited The Debtor's Property Interest In The Pension Plans.

The larger portion of the majority opinion is devoted to the assertion that the Debtor has no property interest in that portion of the United pensions awarded to the Appellee. Because "the Debtor's interest in the United pension plan[s] was limited under the state court order and the ERISA statute," the majority opinion contends, "on the petition filing date the Debtor was entitled to only a percentage of the pension funds, with the remaining portion of the pension[s] subject to the Appellee's right to obtain a QDRO." I disagree.

The majority opinion first contends that two provisions of the Order restricted the Debtor's property interest in the pension plans, or otherwise limited the Debtor's access to the plans. The Order provided that (1) the amounts awarded to the Appellee were to be separately accounted for until the Appellee received her benefits; and (2) the benefits awarded by the Order could not be transferred, voluntarily or involuntarily, until distributed to the Appellee.

These terms of the Order are irrelevant, since they have no legal effect. As already noted, ERISA supersedes state law, meaning any "decisions ... or other State action having the effect of law" issued by any state "instrumentality ... which purports to regulate, directly or indirectly, the terms and conditions" of an ERISA-qualified pension plan. 29 U.S.C. § 1144(a), (c)(1), (c)(2). A segregation requirement did apply temporarily (see the discussion beginning in the next paragraph); however, this temporary restriction was in no way a product of the Order, but only of ERISA, and the Order was ineffective to extend the restriction in any manner.

The majority opinion next turns to several provisions of ERISA that allegedly restricted the Debtor's property interest in the pension plans. During the period where a plan administrator or court of competent jurisdiction is determining whether an order qualifies as

a QDRO, the majority opinion notes, the plan administrator is required to segregate in a separate account funds that would have been payable to the alternate payee if the order in fact is a QDRO. By this the majority opinion suggests that the existence of the Order caused ERISA to limit the Debtor's property interest in the pension plans, even though the Order was not a QDRO.

I cannot agree with this conclusion. If an order presented to a plan administrator is determined not to be a QDRO (or if 18 months elapse from the time benefits would first be payable under the order), the duty to segregate is terminated and the plan administrator must pay such funds over to the plan participant.[3] Thus, the segregation of funds does not protect alternate payees whose order does not qualify as a QDRO. Even alternate payees with QDRO's only receive protection if the QDRO issue is resolved within 18 months.

This provision demonstrates that ERISA does not limit the plan participant's property rights in the absence of a QDRO. Limited segregation[4] is provided as a protection against irreparable harm for alternate payees who have a QDRO. Alternate payees whose order does not qualify as a QDRO do not receive the benefit of this minimal protection. ERISA does not limit the Debtor's property interest in the pension plans, as the majority opinion contends; these provisions again demonstrate that the Debtor's property interest in the pension plans is unlimited in the absence of a QDRO.

Moreover, the "segregated fund" argument would not affect the result here even if the logic of the argument were accepted. It appears from the record that the Debtor was not receiving plan benefits during the time that the plan administrator was evaluating whether the Order was a QDRO. Thus, the plan administrator would not have segregated any benefits for the Appellee. Even if plan benefits had been segregated, that segregation terminated approximately six months before the debtor filed bankruptcy, when the plan administrator rejected the order as a QDRO. With no funds segregated on the petition date, ERISA neither created nor recognized any limitation on the Debtor's interest in the United pension plans.[5]

The restrictions set forth in the Order were preempted by ERISA, and of no legal effect. Contrary to the majority opinion's suggestion, ERISA itself demonstrates that alternate payees receive no protection in the absence of a QDRO. Even if the logic of the majority opinion's argument was accepted, no portion of the Debtor's pension plans was subject to segregation on the petition date. I therefore must reject the majority opinion's conclusion that the Debtor's property interest in the pension plans was limited on the petition date.

### 7. The Appellee's Right To Plan Benefits Was A "Claim" Against The Debtor.

The majority opinion also contends that the Appellee did not have a claim against the Debtor, because the obligation to pay pension benefits was not due at the time the Debtor filed bankruptcy. In support, the majority

---

3. The relevant portion of ERISA provides:
   (iii) If within 18–month period described in clause (v)
   (I) it is determined that the order is not a qualified domestic relations order, or
   (II) the issue as to whether such order is a qualified domestic relations order is not resolved,
   then the plan administrator shall pay the segregated amounts (including any interest thereon) to the person or persons who would have been entitled to such amounts if there had been no order.
   29 U.S.C. § 1056(d)(3)(H)(iii). *See also* 26 U.S.C. § 414(p)(7)(C) (same).

4. Segregation applies only to benefits that would have been paid to the alternate payee during the

time the plan administrator is considering whether the order is a QDRO. *See* 29 U.S.C. § 1056(d)(3)(H)(i) (during the time the plan administrator is determining whether an order is a QDRO, "the plan administrator shall separately account for the amounts ... which would have been payable to the alternate payee *during such period* if the order had been determined to be a qualified domestic relations order.") (emphasis added); 26 U.S.C. § 414(p)(7)(A) (same).

5. Note in addition that the limitation on the Debtor's property interest in the pension plans would not be the full amount awarded the Appellee, but only the segregated amounts, *i.e.*, those benefits that would have been payable until the QDRO issue was resolved.

opinion cites *Teichman v. Teichman (In re Teichman)*, 774 F.2d 1395 (9th Cir.1985), and the alternative holding in *Bush v. Taylor*, 912 F.2d 989 (8th Cir.1990). This position contradicts the plain language of the statutory definition of "claim," and fails to properly interpret either *Teichman* or *Bush*, both of which were non-ERISA cases where a property interest had been created in the pension plan prepetition.

The majority opinion provides a quite thorough discussion of the definition of "claim," noting the breadth that is accorded that term. I would further note that the term "claim" expressly includes "unmatured" rights to payment. 11 U.S.C. § 101(5)(A). "Claim" also includes "contingent" rights to payment, *id.,* meaning a debt " 'which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor.' " *Fostvedt v. Dow (In re Fostvedt)*, 823 F.2d 305, 306 (9th Cir.1987) (quoting *Brockenbrough v. Commissioner*, 61 B.R. 685, 686 (W.D.Va.1986)) (interpreting 11 U.S.C. § 109(e)). Thus the plain language of the statutory definition of "claim" includes obligations where payment is not yet due. By holding that the Appellee has no "claim" because pension benefits will only be paid in the future, the majority opinion effectively allows a debtor's unmatured obligations to pass through bankruptcy without being discharged—a radical narrowing of the scope of bankruptcy relief.

A closer examination of *Teichman* and *Bush* demonstrates that neither case reached this result. In *Teichman*, the Ninth Circuit Court of Appeals addressed the question of whether a husband could discharge through bankruptcy the obligation to convey a percentage of his military pension to his former wife. Unlike here, however, the wife had a perfected property interest in half the pension from the effective date of the state court's order. "The district court correctly held that under the dissolution decree, the wife has an ownership interest in forty-three percent of the retirement fund." 774 F.2d at 1398. However, the state court could not

order the United States to make direct payments to the wife of her share; instead, it had to order the husband to turn over the wife's share of the payments after the husband received each check. 774 F.2d at 1398.

For this reason, the obligation to turn over the proceeds was not a debt. Each check the husband received from the pension, although made payable to him, in fact contained the wife's proceeds. The husband had no property interest in the wife's share of the proceeds. The obligation to pay the wife was not a payment of a debt owing the wife, but a transfer of the wife's property to her possession. This obligation arose only upon the receipt of the check, and therefore was not a debt. 774 F.2d at 1398.

*Bush v. Taylor*, 912 F.2d 989 (8th Cir. 1990), is distinguishable for exactly the same reasons. In *Bush*, the wife was awarded a one-half interest in the husband's government pension plan. 912 F.2d at 990. As in *Teichman*, the government mailed a check for the full amount each month to the husband, who was then obligated to pay over to the wife her portion of the check. 912 F.2d at 990. (The obligations between the husband and wife were later modified in a manner not relevant here.) The husband subsequently filed a petition for relief in bankruptcy. The Eighth Circuit held, in an alternative holding relying upon *Teichman*, that the bankruptcy discharge had no effect on the husband's obligation to remit the wife's portion of future pension payments, because those payments were not yet due and payable. 912 F.2d at 993.

In both *Teichman* and *Bush* the wife had obtained a property interest prepetition, through the state court's order dividing the community property. Neither case involved ERISA, so the state court order was immediately effective in this regard. In the present case, the Order was ineffective to create the property interest found in *Teichman* and *Bush*, because the Order was not a QDRO. The majority opinion misapplies *Teichman* and *Bush* to undercut the plain definition of "claim," a result that neither court intended.[6]

6. The majority opinion asserts that it relies upon *Teichman* and *Bush* for the proposition that the

Appellee does not have a claim *against the Debtor*. I cannot agree. The Debtor has a valuable

The majority opinion also relies upon two lower court decisions. *Bigelow v. Brown (In re Brown)*, 168 B.R. 331 (Bankr.N.D.Ill. 1994); *Long v. Donahue (In re Long)*, 148 B.R. 904 (Bankr.W.D.Mo.1992).

In *Long*, the court cited the statutory definitions of "debt" and "claim," and then stated that the former spouse "has something other than a right to payment from the Debtor or his property." 148 B.R. at 908. The court then stated:

> As discussed above, a domestic relations order not in the form of a QDRO does not create an enforceable right to benefits against an ERISA-qualified pension; therefore, Ms. Donahue's right to obtain a QDRO can not be classified as a debt. The Decree of Dissolution gave Ms. Donahue a right to obtain the QDRO and transfer legal ownership of her portion of Debtor's pensions awarded as marital property.·

148 B.R. at 908. In other words, the *Long* court held that since there is no enforceable right to payment in the absence of a QDRO, there is no "debt."

"To hold that a claim for contribution arises only when there is an enforceable right to payment appears to ignore the breadth of the statutory definition of 'claim.'" *California Dep't of Health Services v. Jensen (In re Jensen)*, 995 F.2d 925, 929 (9th Cir.1993) (rejecting contention that liability for environmental contamination was not a "claim" until response costs had been incurred). Although a right to payment is unenforceable in the absence of a QDRO, this does not mean that the Appellee has no right to payment. "Right to payment" is not determined by the creditor's ability to immediately levy on property without any further court action, but rather on the creditor's legal right to obtain payment. As previously noted, "claim" includes both contingent and unmatured obligations. An unsecured creditor without a judgment has a "claim," even though the creditor has no current right to

garnish the debtor's wages or levy against the debtor's property. 11 U.S.C. § 101(5)(A) ("whether or not such right is reduced to judgment, ... unliquidated, ... [or] disputed."). The Appellee has both a right to payment and a state court judgment recognizing that right. The Appellee's right to obtain a QDRO is analogous to a judgment creditor's right to attach the debtor's property—a final step necessary to actually obtain satisfaction of the right to payment.

*Long* attempted to distinguish *Guidry*, holding a constructive trust could be imposed because the nondebtor spouse had a right to obtain a QDRO. 148 B.R. at 909. *Guidry* expressly stated that a constructive trust could not be imposed unless an exception to the anti-alienation provision applied. 493 U.S. at 372, 110 S.Ct. at 685. Unqualified domestic relations orders are not excepted from the anti-alienation provision.

In *Brown*, the court held that a dissolution decree immediately divides the property, with the nondebtor spouse obtaining an ownership interest. 168 B.R. at 334–35. The debtor spouse holds the nondebtor's interest in the pension plan in constructive trust. 168 B.R. at 335. "In fact, upon entry of the divorce judgment, the benefits became the sole and separate property of the Plaintiff.... The QDRO merely served to enforce her preexisting property rights in the pension." *Id.* (citation omitted). The court noted the ERISA anti-alienation provision, but stated: "[A]lthough the Plaintiff had no recognizable *legal right* under ERISA to the debtor's pension benefits because she was unable to obtain the QDRO prepetition, the Plaintiff did have an *equitable interest* in the Debtor's pensions arising from the entry of the decree of dissolution." 168 B.R. at 336 n. 6 (emphasis in original). *Brown* simply begs the question, stating that a constructive trust is created even though *Guidry* says it cannot be, and holding that an equitable property

---

property interest in the pension plans; the Order itself is premised on that fact. The Appellee currently lacks any property interest in the Debtor's pension plans, but seeks to use her unsecured judgment to obtain a portion of the Debtor's property. This is a claim against the Debtor. *See* 11 U.S.C. § 102(2) (rule of construction in

Title 11 is that "'claim against the debtor' includes [a] claim against property of the debtor"); *Johnson v. Home State Bank*, 501 U.S. 78, 84–86, 111 S.Ct. 2150, 2154–55, 115 L.Ed.2d 66 (1991) (mortgagee's right to foreclose is a claim, even though the debtor's personal liability has been discharged).

interest exists despite the plain language of the anti-alienation provision.[7]

### 8. ERISA Preemption Conditions General Statements of The Law Regarding Property Rights.

In support of its conclusion that the award of property was effective in the absence of a QDRO, the majority opinion also cites to, or quotes from, numerous cases involving state law. The majority opinion cites *Keller v. Keller (In re Keller)*, 185 B.R. 796, 799 (9th Cir. BAP 1995), for the proposition that when a debtor's ultimate right to receive property is measured by or dependent upon orders which would be issued by a state court, the bankruptcy estate is subject to these rights and the bankruptcy filing cannot enlarge them. Here it is the Appellee, not the Debtor, whose ultimate right to receive property is measured by or dependent on a state court order. Regardless, however, *Keller* is distinguishable, as it involved property that was *in custodia legis* on the date of the bankruptcy petition.

The majority opinion later cites both *Keller* and *Paderewski v. Barrett (In re Paderewski)*, 564 F.2d 1353 (9th Cir.1977), for the proposition that the divorce decree conclusively established the property interests of the Debtor and the Appellee. I have no disagreement with the proposition that state law usually controls such matters. However, neither *Keller* nor *Paderewski* involved ERISA, nor do they suggest that bankruptcy courts should ignore an express federal preemption statute when evaluating property rights. The majority opinion uses *Keller* and *Paderewski* to avoid the ERISA preemption issue, rather than address it.

7. The majority opinion briefly cites *Zick v. Zick (In re Zick)*, 123 B.R. 825 (Bankr.E.D.Wis.1990). *Zick* also involved a QDRO obtained postpetition. *See* 123 B.R. at 828. The *Zick* court merely made the conclusory allegation that the state court's award gave the wife a property interest in the pension plan, without ever recognizing or addressing the ERISA anti-alienation provision. 123 B.R. at 829.

8. The legislative history of the REA amendments that added the QDRO requirements also supports this conclusion.

### 9. The Legislative History Does Not Support A Rejection of ERISA's Plain Language.

The majority opinion contends that its result is consistent with the legislative history of 29 U.S.C. § 1056, noting that one purpose of the QDRO exception was to safeguard the financial security of former spouses of plan participants. Where the statute is clear, there is no need to inquire into the legislative history. *See, e.g., Patterson v. Shumate*, 504 U.S. 753, 761, 112 S.Ct. 2242, 2248, 119 L.Ed.2d 519 (1992). ERISA plainly and unambiguously provides that unqualified domestic relations orders do not create any property interest. "Domestic relations order" is a defined term in ERISA, yet Congress excepted from the anti-alienation provision only the subcategory of *qualified* domestic relations orders. Congress clearly foresaw that there would be domestic relations orders that were not qualified, and directed that those orders were to be of no effect. *E.g., Ablamis*, 937 F.2d at 1458 ("Thus, it is readily apparent that transfers pursuant to state domestic relations laws or rules not exempted under the QDRO exception are governed by the anti-assignment provision." (emphasis in original)). It is difficult to imagine Congress speaking more clearly on the issue. A domestic relations order that is not a QDRO does not create any property interest in an ERISA-qualified pension plan.[8]

The Supreme Court recognized this when it warned, in the specific context of the ERISA anti-alienation provision, against the creation of equitable exceptions to unqualified legislative requirements or prohibitions. The creation of such exceptions, in our view, would be especially problematic in

Under the bill, if a domestic relations order requires the distribution of all or a part of a participant's benefits under a qualified plan to an alternate payee, then the creation, recognition, or assignment of the alternate payee's right to the benefits is not considered an assignment or alienation of benefits under the plan *if and only if the order is a qualified domestic relations order.* S.Rep. No. 98–575, 98th Cong., 2d Sess. 19, *reprinted in* 1984 U.S.C.C.A.N. 2547, 2565 (emphasis added).

the context of an antigarnishment provision. Such a provision acts, by definition, to hinder the collection of a lawful debt. A restriction on garnishment therefore can be defended *only* on the view that the effectuation of certain broad social policies sometimes takes precedence over the desire to do equity between particular parties. It makes little sense to adopt such a policy and then to refuse enforcement whenever enforcement appears inequitable.

*Guidry,* 493 U.S. at 376–77, 110 S.Ct. at 687 (emphasis in original).

The majority opinion also raises the spectre of debtors manipulating the time of filing bankruptcy to deprive spouses of an award of pension benefits. There is no basis for this fear. Section 523 was amended in 1994 to make property settlements nondischargeable in bankruptcy. Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 304(e), 108 Stat. 4106, 4133 (1994), *codified at* 11 U.S.C. § 523(a)(15). This amendment applies to all bankruptcy cases filed after October 22, 1994. *Id.,* § 702(b)(1), 108 Stat. at 4150. Only cases filed before that date would be affected by this decision.

## CONCLUSION

The Order was not a QDRO, did not create a property interest, and therefore is a dischargeable debt. I would REVERSE the Bankruptcy Court's award of summary judgment to the Appellee.