In re David S. KING, Debtor.

David S. KING, Plaintiff,

v.

Francine E. KING, Defendant.

Bankruptcy No. 92–53820.
Adversary No. 92–5319.

United States Bankruptcy Court,
D. Connecticut.

Oct. 23, 1997.

David S. King, Woodbridge, CT, Pro se.

Irving H. Perlmutter, New Haven, CT, for Defendant.

## MEMORANDUM OF DECISION ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBTS

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

This adversary proceeding requires the Court to make several complex determinations of the dischargeability of certain obligations created under the terms of a divorce decree. Since this proceeding arises in a bankruptcy case which predates the effective date of "new" Bankruptcy Code Section 523(a)(15), the dispositions reached here will have little, if any, precedential value. However, this Court has determined to rule by written memorandum due to the uniqueness and complexity of the issues presented.

### II. JURISDICTION

The United States District Court for the District of Connecticut has subject matter jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(*l*).

## III. BACKGROUND

### A. Procedural History.

This bankruptcy case was commenced through the Debtor's filing of a voluntary petition, and this Court's simultaneous order for relief, under Chapter 7 of the United States Bankruptcy Code on November 10, 1992 (hereafter referred to as the "Petition Date"). Thereafter, the Debtor–Plaintiff instituted this adversary proceeding through the filing of a Complaint (hereafter referred to as the "Complaint") seeking a determination and declaration of the dischargeability of certain obligations imposed upon him by a domestic relations judgment entered by the Connecticut Superior Court on July 6, 1992 (judgment hereafter referred to as the "Decree"). The Defendant has counterclaimed, seeking a determination and declaration that the Plaintiff's conduct with respect to a certain deposit account created a debt to her for willful and malicious injury, which she claims is non-dischargeable under the terms of 11 U.S.C § 523(a)(6).

### B. Factual Background.

The Plaintiff was, at all times relevant hereto, a legal educator. The Defendant was, at all times relevant hereto, a lawyer employed in the banking industry. The parties were married in January 1986, and divorce proceedings were instituted by the Plaintiff on or about March 13, 1991. Their relatively brief union produced no children.

On May 13, 1991, the Plaintiff withdrew the sum of $10,000 from a deposit account titled jointly in the names of the parties, and thereafter placed those funds in a deposit account titled in his name alone.

In or about August 1991, the Defendant cashed, or endorsed to her own account, a federal income tax refund check in the amount of $6,499.00 drawn to the order of both of the parties. The Defendant had received specific authorization from the Connecticut Superior Court to use only $1,375.00 of said refund for her individual expenses.

The parties' marital dissolution was tried to State Trial Referee John Ottaviano, Jr. (hereafter referred to as the "Referee") in February and March of 1992, and culminated in the entry of the Decree. Certain material provisions of the Decree are *not* contested between the parties. Among those provisions with direct relevance to this proceeding is the Decree's award of periodic alimony to the Defendant, to wit: "$325 per week ... when the defendant's gross earnings are $700 per week or less, and ... $250 per week ... if the defendant's gross earnings exceed $700 per week; termina[ble] upon the happening of the earliest of any of the following events: (1) the death of either party; (2) the remarriage of the defendant or her cohabitation pursuant to statute; or (3) July 6, 1995". *Decree* at p. 2 (hereafter referred to as the "Periodic Alimony Award").

The Complaint identifies several other financial provisions of the Decree which the Plaintiff contends create debts that *are* dischargeable in this case. Those which remained in issue at the time of trial of this adversary proceeding are the following [1]:

1. "... the plaintiff shall pay to the defendant lump sum alimony in the amount of $10,000 payable in four (4) quarterly installments of $2500 each commencing October 1, 1992 and continuing thereafter on January 1, 1993, April 1, 1993 and July 1, 1993...."

2. "... the defendant shall transfer and convey to the plaintiff all of her right, title and interest in and to the premises located at and known as No. 20 Centerview Road in the Town of Woodbridge, Connecticut, and the plaintiff is ordered to deliver to the defendant his non-interest bearing promissory note in the sum of ... $20,000 ... which note shall be secured by a mortgage on the premises ... which note shall be payable on or before July 5, 1995 and in the event the aforesaid promissory note is not paid on or before July 5, 1995, then the note shall accrue interest from the date of said note to the date of

---

1. The Complaint had placed in issue one additional provision of the Decree. That provision imposed an obligation upon the Plaintiff to "indemnify and hold harmless" the Defendant with respect to certain liabilities. The Defendant conceded at trial that any debts created by such obligation are dischargeable in this bankruptcy case.

payment at the rate of six (6%) per centum per annum, and said note shall provide for payment of the costs of collection including a reasonable attorney's fee, and as further provisions of said note, that in the event the property is sold and the note is not paid, or the plaintiff shall die leaving the note unpaid, then said note shall be paid together with interest from the date of its issue at the rate of six (6%) per centum per annum and the costs of collection, including a reasonable attorney's fee...."

3. "The defendant is hereby entitled to share in the plaintiff's pension plan to the extent of ten (10%) percent of the accrued value of the same as of March 6, 1992 and the attorney for the defendant shall prepare an appropriate Qualified Domestic Relations Order to provide for the defendant's participation in the plaintiff's pension plan at the earliest date the plaintiff's pension plan becomes distributable to the plaintiff without penalty...."

4. "... the plaintiff shall pay to the defendant the sum of $3500 as an allowance to defend, and the same is ordered payable as follows: the sum of $1750 within ninety (90) days hereof and the balance of $1750 within ninety (90) days thereafter...."

5. "The bank accounts and securities accounts of the parties are found to be the sum of $51,562.20 as of February 18, 1992 and these accounts are to be divided equally between the parties...."

*Decree* at pp. 2–5.

Several events with potential relevance to this proceeding occurred after entry of the Decree. By letter dated October 8, 1992. the Defendant's attorney transmitted to the Plaintiff's divorce attorney a draft of "a mortgage note and deed" referenced in Paragraph 2, above, which the letter requests the Plaintiff to "execute ... and return...." The letter also enclosed a draft of the Qualified Domestic Relations Order (hereafter referred to as a "QDRO") referenced in Paragraph 3, above, which the let-

ter states, "requires information from your client in order to have the same signed by Judge Ottaviano".. In the letter the Defendant's attorney indicates that when these documents are returned he will have his client "sign the quitclaim deed and conveyance tax documents [and] undertake recording of the documents ..." Neither the Plaintiff nor his attorney complied with Defendant's attorney's request to execute and return the referenced documents [2], although the reason(s) why are not entirely clear from the record.[3]

On June 18, 1993, the Defendant recorded a copy of the Decree on the Land Records of the Town of Woodbridge, Connecticut.

## IV. DISCUSSION

A bankruptcy discharge has the following effects, *inter alia:*

(1) [it] voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727 ... of.. title [11] ... [and]

(2) [it] operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor....

11 U.S.C. § 524(a) (1993)

A debtor in a Chapter 7 case receives a discharge of debts under the authority of Section 727(b) of the Bankruptcy Code which provides, in relevant part, that *"[e]xcept as provided in section 523 of this title, a discharge ... discharges the debtor from all debts that arose before the date of the order for relief under this chapter ...."* (emphasis supplied).

This adversary proceeding seeks to determine the dischargeability of certain alleged debts under the standards of Bankruptcy

---

**2.** Nor was there compliance with a second request of similar tenor made upon the Debtor directly by letter dated November 3, 1992.

**3.** There is some indication in the record that there was a disagreement among the parties as to the appropriate language of the QDRO and mortgage deed.

Code Section 523, which provides in pertinent part as follows:

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> > (5) to a spouse ... [or] former spouse ... of the debtor ... for alimony to, maintenance for, or support of such spouse ... in connection with a ... divorce decree or other order of a court of record ... but not to the extent that—
> >
> > \*    \*    \*    \*    \*    \*
> >
> > (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support;
> >
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity....

11 U.S.C § 523(a) (1993).

The party opposing the bankruptcy discharge of a particular debt bears the burden of proving by a preponderance of the evidence that the requirements of the relevant subsection of Section 523(a) have been met. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Thirtyacre,* 36 F.3d 697 (7th Cir.1994).

## A. Dischargeability of Domestic Relations Obligations—Section 523(a)(5).

■ In cases brought under Section 523(a)(5), the task of the Bankruptcy Judge is to determine with respect to each contested obligation whether the alleged obligation (1) constitutes a "debt", (2) "arose" prior to the bankruptcy order for relief, and (3) is "actually in the nature of alimony, maintenance, or support."

### 1. Existence of a Debt.

■ Not every obligation imposed by a divorce decree creates a "debt"; each such obligation must be separately analyzed. The term "debt" is defined by the Bankruptcy Code as "liability on a claim". 11 U.S.C. § 101(12) (1993). The term "claim", in turn, means "right to payment ... or ... right to an equitable remedy for breach of performance if such breach gives rise to a right to

payment...." 11 U.S.C. § 101(5) (1993). The United States Supreme Court has instructed that Congress intended by this language to adopt the broadest available definition of "claim". *Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 2154, 115 L.Ed.2d 66 (1991).

### 2. Timing of Debt.

The date on which a debt arises is also critical in determining whether such debt is dischargeable in a given bankruptcy case. In a voluntary Chapter 7 case such as this one, only debts arising prior to the petition date are eligible for discharge. 11 U.S.C. § 727(b). Stated somewhat differently, debts arising *after* the petition date of a given bankruptcy case cannot be discharged in that case, but *may* be eligible for discharge in a later case. *Cf.* 11 U.S.C. § 727(a)(8) (1993).

### 3. Nature of Debt.

■ As noted above, the substantive inquiry required in assessing the dischargeability of domestic relations debts under Section 523(a)(5) is whether such debts are in the "nature of" alimony, maintenance or support. An obligation is in the nature of alimony, maintenance or support when it is intended to provide support for the spouse. Although a bankruptcy judge may consult state law for guidance as to whether a debt is actually in the nature of alimony, maintenance or support, the determination is necessarily one premised upon federal bankruptcy law, *see Forsdick v. Turgeon,* 812 F.2d 801, 802–03 (2d Cir.1987); *Pauley v. Spong,* 661 F.2d 6, 9 (2d Cir.1981). In certain circumstances this federal law analysis is an analytically distinct exercise from that which a Connecticut state court employs in granting awards of "alimony, maintenance or support". *In re Edwards* 162 B.R. 83 (D.Conn.1993) (Cabranes, J.).

■ Therefore, assuming for the moment that all obligations at issue in this proceeding are pre-petition "debts", this Court's task under Section 523(a)(5) is to determine whether the Connecticut Superior Court intended those obligations to be for the support or maintenance of the former spouse, or

to effect some other purpose, such as a division of property or as punishment for fault leading to the underlying dissolution. *See id.*

Traditionally, courts of bankruptcy jurisdiction have focused on whether a given obligation was intended either (1) to address the unequal earning capacities of the parties—suggesting a nondischargeable "support" purpose, or (2) to allocate the marital assets—suggesting a dischargeable property division.[4] In the instance of a decree issued under the law of a state such as Connecticut, where "fault" may be ascribed, and form the basis for financial awards in a marital dissolution, *see, e.g.,* Connecticut General Statutes (hereafter cited as "C.G.S.") 46b–82 (1991) (referencing "the causes of the dissolution of the marriage" as a proper consideration in awarding alimony), the Bankruptcy Court must consider whether the divorce court's award was animated by a possible third purpose: punishment of the party at fault. *See Edwards,* 162 B.R. at 85–86. An award intended as a punitive measure would be dischargeable under Section 523(a)(5)(B) since it does not serve a support purpose.

These determinations of dischargeability can only be made on a case-by-case, issue-by-issue basis. Among the factors traditionally utilized by courts in divining the actual nature of an obligation imposed in a divorce decree are the following: (1) the label given the obligation in the decree, (2) the form and placement of the obligation in the decree, (3) whether the obligation terminates on death, remarriage, etc., (4) the economic disparity between the parties, (5) the length of the marriage, (6) the presence of minor children, (7) whether a traditional sup-

port award would have been adequate in the absence of the obligation in question, (8) the age, employability, and educational level of the parties, and (9) the financial resources, actual or potential, of each spouse.

However, the consideration of such factors must occur in a tightly circumscribed evidentiary context. As Chief Bankruptcy Judge Alan H.W. Shiff observed in the *Edwards* case on remand, initial recourse must be made to the language of the divorce decree. *In re Edwards,* 172 B.R. 505, 508 (Bankr.D.Conn.1994). If the state court's intention is not clear from the decree itself, then the Bankruptcy Court may "look beyond the four corners of the decree to the *evidence before [the state] court . . . ." Id.* (emphasis supplied)[5]. It follows, then, that material *not* admitted before the state court is rarely, if ever, relevant to a Section 523(a)(5) adversary proceeding in this Court.[6]

Both parties attempted to testify in this Court as to certain matters allegedly considered by the Referee in rendering the Decree. To the extent that such testimony was permitted, it will not be credited by this Court since there is no independent evidence that the Referee considered those facts. Aside from the Decree itself (Trial Exhibit 1), the only materials introduced at the trial of this proceeding which were also evidence at the parties' divorce trial in the Superior Court were the following: (1) the Financial Affidavits of the parties as of February 1992 (Trial Exhibits 4 and 5) and (2) a two-page excerpt (pp. 150–151) from the transcript of the divorce trial, relating to the use of the proceeds of a tax refund (Trial Exhibit 8).[7] Nei-

---

4. The Bankruptcy Reform Act of 1994 added to the Bankruptcy Code new subsection 523(a)(15), which allows, under a set of equitable standards, for the non-dischargeability of *non*-support domestic relations obligations. This amendment is applicable only to bankruptcy cases filed after October 22, 1994, and therefore does not provide a rule of decision for the instant adversary proceeding.

5. However, because this Courts inquiry is limited to the *intention* of the Superior Court, even proof of matters merely *presented* to that court may be of questionable probative value.

6. The Second Circuit has warned Bankruptcy Courts against considering certain aspects of the

parties' changed circumstances since the time of the divorce decree. *Forsdick, supra,* at 803–04.

7. The Defendant offered, and this Court admitted into evidence, a copy of a Motion to Open Taking of Evidence dated April 30, 1992 (Trial Exhibit 7) and its accompanying cover letter of Attorney Perlmutter (Trial Exhibit 6). Through that motion the Defendant allegedly sought to apprise the Superior Court of a negative change in the Defendant's employment status. The Defendant's testimony in this Court indicates that these Exhibits were transmitted to the Superior Court but never acted upon. Accordingly, they will not be credited by this Court.

ther party sought to admit at trial a full transcript of the Superior Court trial.

## B. Analysis of Dischargeability of Individual Decree Obligations.

Against the foregoing background of relevant evidence and legal authority the Court now turns to analyze the dischargeability of each obligation at issue.

### 1. Lump Sum Alimony

"... the plaintiff shall pay to the defendant lump sum alimony in the amount of $10,000 payable in four (4) quarterly installments of $2500 each commencing October 1, 1992 and continuing thereafter on January 1, 1993, April 1, 1993 and July 1, 1993...."

*Decree* at pp. 2–3.

■ Analysis of the Decree's award of "lump sum alimony" is illustrative of the Bankruptcy Code's support/property division dichotomy. The Defendant focuses on the Decree's conscious use of the term "alimony". The Plaintiff contends that despite the label "alimony", the lump sum award was not "actually in the nature of alimony, maintenance, or support" within the meaning of Section 523(a)(5)(B) because it does not bear some of the hallmarks of traditional alimony, such as termination upon remarriage or death. He also believes that the Referee's structuring of the income-dependent Periodic Alimony Award indicates an intention that the periodic award serve as the exclusive "support" device, rendering all other dispositions property divisions.

Given the sparse record created by the parties, this Court is left essentially with the Decree alone as evidence of the Referee's intention. This Court observes at least two aspects of the Decree which militate in favor of finding a "support" purpose behind the lump sum alimony award. First, this Court gives initial deference to the appellation, "lump sum alimony", utilized by the Referee. Second, the fact that the lump sum payments are not ordered to be paid from, or with reference to, a specific fund or *res*, leads this

Court to conclude that the lump sum award was not intended to unscramble assets. Thus the award either had a support purpose or was intended as punishment of the Plaintiff for fault in the marriage. The Decree does not allude to "fault" on the part of either spouse. Therefore, the lump sum award must have been intended to serve a support function, and, as a result, is not dischargeable in the Plaintiff's bankruptcy case.

### 2. Mortgage Note Obligation

"... the defendant shall transfer and convey to the plaintiff all of her right, title and interest in and to the premises located at and known as No. 20 Centerview Road in the Town of Woodbridge, Connecticut, and the plaintiff is ordered to deliver to the defendant his non-interest bearing promissory note in the sum of ... $20,000 ... which note shall be secured by a mortgage on the premises ... which note shall be payable on or before July 5, 1995 and in the event the aforesaid promissory note is not paid on or before July 5, 1995, then the note shall accrue interest from the date of said note to the date of payment at the rate of six (6%) per centum per annum and said note shall provide for payment of the costs of collection including a reasonable attorney's fee, and as further provisions of said note, that in the event the property is sold and the note is not paid, or the plaintiff shall die leaving the note unpaid, then said note shall be paid together with interest from the date of its issue at the rate of six (6%) per centum per annum and the costs of collection, including a reasonable attorney's fee...."

*Decree* at p. 3.

■ The Plaintiff's obligation to deliver a $20,000 mortgage note to the Defendant, and make payment thereon (hereafter referred to as the "Mortgage Note Obligation") represents one side of a classic division of property. In this case the property being divided was the perceived equity in the marital residence (hereafter referred to as the "Residence"). Therefore, the Plaintiff's "debts" [8]

8. The Plaintiff's obligation to deliver the promissory note is a "debt" within the meaning of the

Bankruptcy Code because prior to bankruptcy the Defendant had an equitable remedy, enforce-

in that respect are dischargeable in this bankruptcy case.

Plainly the impact of this ruling will be to relieve the Plaintiff from any obligation to make payment to the Defendant pursuant to the subject mortgage note. However, the harshness of this result from the perspective of the Defendant is ameliorated by this Court's further finding and conclusion that the Defendant retained, as of the trial of this proceeding, her pre-dissolution property interest in the Residence. In making this determination the Court observes that the Decree does not itself operate to effect a transfer of the Defendant's interest in the residence to the Plaintiff; it merely orders her to execute and deliver a deed to that effect.

Nor does the Defendant's recording of the Decree on the Town of Woodbridge Land Records effect a conveyance to the Defendant. The Court notes that under the authority of C.G.S. § 46b–81(b) (1993) the recording of a decree on the Land Records "effect[s] the transfer of the title of ... real property as if ... [the decree] were a deed...." However, this effect is only achieved if the decree is self-executing, *i.e.* it purports to "pass title to real property ... without any act by either the husband or the wife...." C.G.S. § 46b–81(a) (1993). As noted above, the Decree in this case does not purport to be self-executing, it merely instructs the *parties* to effect certain conveyances.

Of course the Plaintiff could move in the Superior Court to compel the conveyance to him; and by the same token, the Defendant could resist that effort, and/or move to modify the Decree, in light of this Court's determination of dischargeability of the Mortgage Note Obligation. This Court need not speculate on the outcome of any such proceedings in the Superior Court, leaving such matters to the sound discretion of that Court.

### 3. Pension Plan Participation

"The defendant is hereby entitled to share in the plaintiff's pension plan to the extent of ten (10%) percent of the accrued value of the same as of March 6, 1992 and the attorney for the defendant shall prepare an appropriate Qualified Domestic Relations Order to provide for the defendant's participation in the plaintiff's pension plan at the earliest date the plaintiff's pension plan becomes distributable to the plaintiff without penalty...."

*Decree* at pp. 4–5 (hereafter referred to as the "Pension Award").

In contrast to his ruling with regard to the Residence, in creating the Pension Award the Referee desired to effect a *self-executing* assignment of a 10% stake in the value of the Plaintiff's pension plan with the Teachers Insurance and Annuity Association (hereafter referred to as "TIAA") and/or the College Retirement Equities Fund (hereafter referred to as "CREF"), payable to the Defendant directly from the plan "at the earliest date the ... pension plan becomes distributable to the plaintiff without penalty...."

The Referee recognized, however, that federal law, specifically the Employee Retirement Income Security Act (hereafter referred to as "ERISA")[9], prevents a domestic relations pension assignment unless made pursuant to a Qualified Domestic Relations Order. Consequently, he directed the Defendant's attorney to prepare a proper QDRO. As noted in note 3, *supra*, the parties appear to have disagreed over the language of the proposed QDRO, and the Defendant failed to submit it to either the Superior Court or the Plaintiff's pension plan.

At the outset, it is important to observe that the Pension Award was plainly intended as a division of property—a judicial allocation of an asset acquired during the period of the parties' marriage. This award serves little, if

---

ment of which would give rise to a "right to payment" within the meaning of 11 U.S.C. § 101(5).

**9.** This Court finds that the pension plan is an "ERISA-qualified" plan. The Referee assumed this fact in his Decree, and neither party has

presented evidence to the contrary in this Court. This finding is also consistent with the decisions of other courts which have found TIAA and CREF plans to be ERISA-qualified. *E.g. In re Bennett,* 185 B.R. 4 (Bankr.E.D.N.Y.1995).

any, "support" purpose since no portion of the benefit it bestowed on the Defendant was sure to be distributed to her until the Plaintiff reached retirement age. The Referee expressed no opinion, and could not have known, the financial circumstances of the Plaintiff and Defendant at such future time as the pension became distributable. Under this analysis, any "debt" which the Plaintiff owed to the Defendant on the Petition Date in connection with the pension would be dischargeable notwithstanding Section 523(a)(5).

■ Having now concluded that any debt the Plaintiff might owe the Defendant with respect to the Pension Award is dischargeable, the Court turns to a more fundamental and difficult question—whether, in fact, the Plaintiff has any prepetition "debts" with respect to the Pension Award. Under the Bankruptcy Code the terms "debt" and "claim" are two sides of the same coin, the former from the perspective of a debtor and the latter from the perspective of the subject creditor. The term "debt" is defined as "liability on a claim". 11 U.S.C. § 101(12) (1993). The term "claim", in turn, means:

(A) *right to payment,* whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent,* matured, *unmatured,* disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) *right to an equitable remedy for breach of performance if such breach gives rise to a right to payment,* whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured....

11 U.S.C. § 101(5) (1993) (emphasis supplied).

The United States Supreme Court has instructed that Congress intended by this language to adopt the broadest available definition of "claim". *Johnson v. Home State Bank, supra.* Heeding this instruction, this Court interprets the Pension Award to create "debts" owing from the Plaintiff to the Defendant.

It might be argued that the Defendant has no claim against the Plaintiff because she has no "right to payment" from *him,* but only a right to be paid from the pension plan. However, the operative language of the Pension Award places, at the very least, a *contingent* obligation upon the Plaintiff. Because the Referee used the general phrase "... is hereby entitled to share ....", as opposed to a more specific phrase such as, "... is hereby assigned an interest ....", the Plaintiff is *contingently* obligated under the Decree for the value of the 10% pension stake *should the pension plan fail or refuse to make payment thereof.*[10] The contingent right to payment is also *unmatured* since the Plaintiff would not be obligated to pay the Defendant until the pension was able to be distributed to him.

One might also argue that the Plaintiff owes no debt to the Defendant in connection with the Pension Award because the assignment of property that the award contemplates was complete on the Petition Date. It is true that where a domestic relations assignment of a property interest is completed—by operation of law, the acts of the parties, or otherwise—prior to a debtor's filing of a bankruptcy petition, the debtor's ex-spouse's rights in that property are fixed[11], and the debtor has no "debt" to discharge with respect to the assignment. In this case, however, as of the Petition Date no legally-completed assignment of pension rights to the Defendant had been accomplished.

The Decree itself could not effect an assignment of pension rights, as it might have with other types of property, because the pension plan's ERISA-compelled anti-alien-

---

**10.** The Court also implies from the language of the Decree a duty of the Plaintiff to provide reasonable assistance to the Defendant's attorney in his preparation of a QDRO. The default of the Plaintiff to so cooperate could lead the pension plan not to recognize the Defendant's stake, and consequently not pay her. This course of events, initiated by the Plaintiff's default, would create a "right to payment" from the Plaintiff. Therefore, the Plaintiff's duty is a debt because breach of the duty "gives rise to a right of payment" and the Defendant has a "right to an equitable remedy [in the Superior Court] for breach" of that duty. 11 US.C. § 101(5)(B) (1993).

**11.** Subject, of course, to potential avoidance by a bankruptcy trustee. *See, e.g.,* 11 U.S.C. § 548(a) (1993).

ation provision, *see* 29 U.S.C. § 1056(d)(1) (1992)[12], preempts all state law under which an assignment might be made unless such assignment is accomplished through a QDRO. 29 U.S.C. § 1056(d)(3)(A) (1992). A QDRO must be prepared in strict conformance with federal standards, 29 U.S.C. §§ 1056(d)(3)(B)-(E) (1992), and is not effective until deemed "qualified" by the subject pension plan. *See* 29 U.S.C. § 1056(d)(3)(1992). Accordingly, under ERISA, the Referee's intended creation in the Defendant of a 10% stake in the Plaintiff's pension plan was not, and is not, effective unless and until a QDRO is prepared, filed, and deemed qualified. Because these steps were not completed as of the Petition Date, the Defendant held no vested interest in the pension plan, but had, *inter alia*, a contingent and unmatured "right to payment" from the Plaintiff. Thus, there existed on the Petition Date "debt(s)" owed by the Plaintiff with respect to the Pension Award.

The issue of whether a debtor owes "debts" with respect to a domestic relations pension award granted through an order which is not "qualified" under ERISA has been addressed by at least one Circuit Court of Appeals, upon facts superficially similar to those of the instant case. *Gendreau v. Gendreau (In re Gendreau)*, 122 F.3d 815 (9th Cir.1997). In *Gendreau*, a panel of the Ninth Circuit Court of Appeals affirmed the Ninth Circuit Bankruptcy Appellate Panel's affirmance of a Bankruptcy Court's grant of summary judgment in favor of a debtor's ex-spouse on the debtor's complaint to obtain a judgment declaring a domestic relations pension award in favor of the ex-spouse a dischargeable debt in his bankruptcy case. This Court respectfully disagrees with the Ninth Circuit's analysis in *Gendreau*, but, rather, concurs in and adopts the reasoning of Bankruptcy Judge Alfred C. Hagan's scholarly dissent from the Bankruptcy Appellate Panel's Amended Opinion, *In re Gen-dreau*, 191 B.R. 798, 805–14 (9th Cir. BAP 1996) (hereafter referred to as the "BAP Dissent").

In the *Gendreau* case a Virginia Family Court issued a divorce decree on October 2, 1992, awarding the ex-spouse a 50% interest in amounts the debtor accrued in his pension plans during the years of their marriage. On January 25, 1993, the Family Court issued a "Qualified Domestic Relations Order" in presumed compliance with ERISA. On May 17, 1993, counsel for the subject pension plan informed the ex-spouse that the QDRO was in fact not a "qualified" domestic relations order under ERISA. On November 15, 1993, the debtor commenced a voluntary Chapter 7 bankruptcy case. As of that date, the ex-spouse had still not obtained actual qualification of the Family Court's January 25, 1993 "Qualified Domestic Relations Order".

In ruling that the debtor had no pension award-related debts to discharge, the Ninth Circuit reached three conclusions, none of which is persuasive here for the following reasons. First, the Ninth Circuit states that the ex-spouse's—

"... interest in the pension plans (or, at a minimum, her right to obtain a QDRO which would in turn give her an interest in the plans) was established under state law at the time of the divorce decree ... [The debtor's] interest was limited at that time, or at least subject to being limited at any time [the ex-spouse] obtained a QDRO...."

*Gendreau*, 122 F.3d at 818.

In so concluding, the Ninth Circuit denigrates the primacy of federal law by elevating presumed state-created rights of the ex-spouse over the federally-protected property rights of the debtor-pensioner. This creation and limitation of the "rights" and "interests" of the parties is not supported by the plain language of ERISA, and is at odds with ERISA's strict anti-alienation requirement, as consistently recognized by the United

---

12. Subsection (d)(1) provides that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." Although subsection (d)(2) creates an exception to anti-alienation for "any *voluntary and revocable* assignment of not to exceed 10 percent of any benefit payment....", 29 U.S.C. § 1056(d)(2) (1992) (emphasis supplied), it is clear that the Pension Award was neither "voluntary" nor "revocable" within the meaning of that subsection

States Supreme Court. *E.g., Patterson v. Shumate,* 504 U.S. 753, 759–60, 112 S.Ct. 2242, 2247–48, 119 L.Ed.2d 519 (1992); *Guidry v. Sheet Metal Workers Nat'l Pension Fund,* 493 U.S. 365, 376–77, 110 S.Ct. 680, 687, 107 L.Ed.2d 782 (1990); *see also Gendreau,* 191 B.R. at 803–10 (BAP Dissent discussion).

Next, the Ninth Circuit holds that—

"... [the ex-spouse's] claim is against the ... pension plans and not against [the debtor]: ... Therefore, the claim is not a personal liability of [the debtor] that could be discharged by his bankruptcy".

*Gendreau,* 122 F.3d 818.

As a factual matter, *Gendreau* may be distinguishable from the instant case on this point since here the Referee's Decree did not itself order direct payment from the pension plan, although it clearly contemplated that distribution methodology. It was the generality of that language which led this Court to conclude that the Plaintiff is contingently liable to the Defendant should the pension plan fail or refuse to pay her. More fundamentally however, the Ninth Circuit's conclusion necessarily presumes the validity and enforceability of the non-ERISA-qualified Family Court Order. For the reasons discussed above, the primacy of ERISA-mandated anti-alienation clauses precludes the Ninth Circuit's conclusion.

Finally, the Ninth Circuit concludes that—

"... allowing [the debtor] to cut off [the ex-spouse's] interest in the pension plans because of the timing of his bankruptcy petition would be contrary to both ERISA and bankruptcy purposes."

*Id.* at 819.

The fundamental flaw of this conclusion is that it bypasses the traditional process of statutory construction. Simply and general-

ly stated, that process requires that a court look first to the statutory language itself, and then to the legislative history *if the statutory language is unclear. Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) (emphasis supplied).[13] In *Gendreau,* the Ninth Circuit did not undertake an analysis of the plain language of ERISA and the Bankruptcy Code to determine whether either or both were ambiguous. This Court concurs with the BAP Dissent's conclusion that an analysis of the plain language of these statutes compels the result achieved here without recourse to considerations extrinsic to the statutes themselves. *Gendreau,* 191 B.R. at 813–14.

Assuming, though, that recourse to policy considerations other than as expressed through the plain language of the subject statutes is appropriate, this Court disagrees with the Ninth Circuit's analysis of those considerations. The fact that the QDRO exception to ERISA's anti-alienation requirement was enacted to "protect the financial security of divorcees", is not a purpose that is offended by a statutory construction that views rights as alienated only upon the formal qualification of a domestic relations order. Admittedly, under this Court's view, the interplay of ERISA and the 1993 version of the Bankruptcy Code permitted a debtor effectively to nullify any domestic relations property division that was not self-executing. However, this result was supported by the sound bankruptcy policy of equality of treatment of creditors, since the property of which the ex-spouse was initially deprived was nonetheless available for liquidation and distribution to *all* creditors—including the ex-spouse—pursuant to an equitable priority scheme.[14] This Court recognizes that under

---

13. The Supreme Court has also acknowledged that in "rare cases" when the literal application of a statute produces a result "demonstrably at odds with the intentions of its drafters", the intention of the drafters, rather than the strict language, should control. *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982).

14. This salutary policy was arguably undermined to the extent that the subject property was "exempt", and therefore retained by the debtor over the rights of his creditors. Yet Congress must have been aware of this effect and deemed it

tolerable. This Court knows of no principled basis, in the Bankruptcy Code or other law, why the exemptability of a particular asset should determine the construction of unrelated statutory provisions. Admittedly, *Shumate's* 1992 declaration of ERISA-qualified pension plan funds as "exempt"—more particularly, as "excluded"— from a bankruptcy estate created a large pool of "exempt" assets which in many jurisdictions had theretofore been available for administration in bankruptcy cases for the benefit of creditors. However, "new" Bankruptcy Code Section 523(a)(15) goes a long way toward ameliorating

the unique facts of an individual case, the result compelled by this equality of treatment policy may produce results which could offend the sensibilities of a given jurist. However, no court is at liberty to bend the applicable law beyond its logical breaking point to achieve a result compatible with its sensibilities. That process of bending and breaking is the appropriate function of Congress. This principle was eloquently and definitively stated by the Supreme Court in *Guidry,* to wit:

As a general matter, courts should be loath to announce equitable exceptions to legislative requirements or prohibitions that are unqualified by the statutory text. The creation of such exceptions, in our view, would be especially problematic in the context of an antigarnishment provision.[15] Such a provision acts, by definition, to hinder the collection of a lawful debt. A restriction on garnishment therefore can be defended only on the view that the effectuation of certain broad social policies sometimes takes precedence over the desire to do equity between particular parties. It makes little sense to adopt such a policy and then to refuse enforcement whenever enforcement appears inequitable. A court attempting to carve out an exception that would not swallow the rule would be forced to determine whether application of the rule in particular circumstances would be "especially" inequitable. The impracticability of defining such a standard reinforces our conclusion that the identification of any exception should be left to Congress.

493 U.S. at 376–77, 110 S.Ct. at 687.

Congress did eventually act to adjust the domestic relations impact of the Bankruptcy Code. The Bankruptcy Reform Act of 1994, struck a blow against the blanket dischargeability of property division debts by adding Section 523(a)(15) to the Code. That new subsection provides a set of equitable standards for the non-chargeability of *non-*support domestic relations obligations such as

property divisions. This legislative action is supportive of the statutory construction this Court adopts since it reflects a tacit congressional acknowledgment that the *proper* legal result under 1992 ERISA, and 1993 bankruptcy, law—the law that governs this case—was at odds with its view of optimal public policy in 1994.

In summary, because of ERISA's anti-alienation provision, the Referee's Pension Award—which was plainly intended as a division of property—failed to vest the Defendant with any property rights in the Plaintiff's pension plan as of the Petition Date. Accordingly, the obligations of the Plaintiff with respect to the Pension Award are dischargeable debts in this bankruptcy case.

### 4. Allowance to Defend

"the plaintiff shall pay to the defendant the sum of $3500 as an allowance to defend, and the same is ordered payable as follows: the sum of $1750 within ninety (90) days hereof and the balance of $1750 within ninety (90) days thereafter...."

*Decree* at p. 5.

On the issue of the Superior Court's ordering an "allowance to defend", *i.e.* a payment of counsel fees, in favor of the Defendant, the Defendant has referred this Court to the opinion of the Second Circuit Court of Appeals in *Pauley v. Spong, supra.* However, *Spong* is not dispositive on the issue of whether an award of counsel fees in a divorce proceeding is dischargeable. The primary issue in *Spong* was whether the fact that the fees were ordered payable to the spouse's attorney, as opposed to the spouse, took the award out of the reach of Bankruptcy Code Section 523. In concluding that it did not, the Second Circuit panel merely endorsed the finding of the Bankruptcy Court that the attorneys fee award was in the nature of support under New York state law. *Spong,* 661 F.2d at 8–9. Therefore, *Spong* does not

---

this expansion of "exempt" property, at least vis-a-vis an ex-spouse.

15. The Pension Award assignment here was intended to operate in substance like a garnish-

ment. It was an involuntary direction of payment from a third party intended to satisfy a debt of the Debtor.

preclude a case-by-case analysis of the nature of an award of attorneys fees.

In the present case the Court determines that the allowance to defend was intended as support and is non-dischargeable in the Plaintiff's bankruptcy case. In Connecticut, allowances of counsel fees in marital dissolution actions are made under the authority of C.G.S. § 46b–62 (1992), which provides in relevant part as follows:

"... the court may order either spouse ... to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b–82."

As noted above, among the criteria set out in C.G.S. § 46b–82 is the "cause", or fault, in the marital breakdown. Thus, *in theory*, the attorney's fee allowance could have been intended to serve as (1) a property division, (2) punishment, or (3) an additional form of support. The fact that the allowance was not ordered to be paid from, or with reference to, a specific fund or *res*, leads this Court to conclude that it was not intended as a property division. Thus the allowance either had a support purpose or was intended as punishment of the Plaintiff. The Decree does not allude to "fault" on the part of either spouse. Therefore, the allowance must have been intended to serve a support function and, as a result, is not dischargeable in the Plaintiff's bankruptcy case. This determination is not inconsistent with the parties' financial affidavits, and is consistent with the lump sum alimony award, which seems to evince an intention on the Referee's part to provide the Defendant it with an initial financial boost to cover the costs of transition to a single lifestyle.

## 5. Deposit Accounts

"The bank accounts and securities accounts of the parties are found to be the sum of $51,562.20 as of February 18, 1992 and these accounts are to be divided equally between the parties...."

*Decree* at p. 5.

■ The parties agree that the ordered division of deposit and securities accounts has been completed in a manner which leaves the Plaintiff obligated to account to the Defendant in the amount of $6,253.81 (hereafter referred to as the "Divisional Shortfall").

The division of accounts appears on its face to have been intended as a property settlement. Nothing in the Decree or other relevant evidence before this Court supports the notion that the division was intended to serve a support function. Accordingly, any debt arising from the Plaintiff's obligations to equalize the division of the parties' deposit and securities accounts is dischargeable in this bankruptcy case.

## C. Willful and Malicious Injury—Section 523(a)(6).

■ By way of counterclaim, the Defendant contends that the Plaintiff's withdrawal of more than half the funds in a deposit account titled jointly in the names of the parties (hereafter referred to as the "Deposit Account") during the pendency of the divorce action, coupled with his failure to pay over the Divisional Shortfall is a conversion and constitutes a willful and malicious injury to her property, giving rise to a nondischargeable claim under 11 U.S.C. § 523(a)(6).

In response to the counterclaim, the Plaintiff argues that in the absence of an order restraining the parties' access to the accounts during the pendency of the divorce action, either party was free to tap the accounts. Thus, he argues, in the absence of proof of an illicit and malicious purpose, he should prevail.

■ Bankruptcy Code Section 523(a)(6) excepts from a debtor's discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity". "Willful" conduct is not defined by the Bankruptcy Code, but is generally held to contemplate a "deliberate or intentional" action. *E.g., Navistar Financial Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir.1996). The term "malicious"—also not defined by the Bankruptcy Code—means "*wrongful and without just cause or excuse*, even in the absence of personal hatred, spite, or ill-will". *Id.* (emphasis sup-

plied).[16]

Under Connecticut law, a joint account holder has a property interest in the entire balance of a deposit account. At all times relevant hereto, C.G.S. § 36–3(1) (1991) stated that when a deposit account was established "in the names of two or more persons and in form to be paid to any one or the survivor, or survivors, of them, such ... account may be paid to any of them during the lifetime of all of them...."[17] This statute has been interpreted to mean that coholders of a joint account are each considered owners of the entire account, with access to the entire amount therein. *U.S. v. First Bank,* 586 F.Supp. 174 (D.Conn.1983). Consequently, unless the terms of the Deposit Account specifically provided otherwise, or orders entered in the parties' marital dissolution action altered the Plaintiff's rights in the Deposit Account, the Plaintiff had a right to withdraw at will any or all of the balance of the Deposit Account. If he had a legal right to withdraw the funds at issue, then such conduct, though clearly "willful" is not "malicious" in the sense of being "wrongful or without just cause".

At the trial of this proceeding there was simply no evidence presented of any circumstances from which it could be implied that the Plaintiff acted with "malice". The Defendant did not attempt to establish that the terms of the Deposit Account conditioned the Plaintiff's rights. She also did not attempt to establish that the Superior Court limited in any manner the Plaintiff's access to the Deposit Account. Finally, the Defendant has not established the existence of a legal duty which would require a spouse to refrain from withdrawing funds from a jointly-held spousal account simply because a marital dissolution action is commenced.

For these reasons the Plaintiff's withdrawal of funds from the Deposit Account was not "malicious" as that term is utilized in Section 523(a)(6). Accordingly, the Defendant does not have a claim against the Plaintiff arising from the nature of his conduct with respect to the Deposit Account, and judgment shall enter in the Plaintiff's favor on the Defendant's counterclaim.

## V. CONCLUSION

Based upon the foregoing analysis, judgment shall enter in this adversary proceeding as follows: (1) in favor of Plaintiff on Paragraphs 4.A. (mortgage note obligation), 4.B. (pension plan obligation), 4.D. (the Divisional Shortfall) and 4.F. (indemnification obligations) of the Complaint; (2) in favor of the Defendant on Paragraphs 4.C. (lump sum alimony) and 4.E. (attorney's fee allowance) of the Complaint; and (3) in favor of the Plaintiff on the Defendant's Counterclaim.

### JUDGMENT

This proceeding having come before the Court after trial, and the Court having this day entered its Memorandum of Decision on Complaint to Determine Dischargeability of Debts, in accordance with which it is hereby

ORDERED that judgment shall enter in this adversary proceeding as follows:

(1) in favor of Plaintiff on Paragraphs 4.A. (mortgage note obligation), 4.B. (pension plan obligation), 4.D. (account division shortfall) and 4.F. (indemnification obligations) of the Complaint;

(2) in favor of the Defendant on Paragraphs 4.C. (lump sum alimony) and 4.E. (attorney's fee allowance) of the Complaint; and

(3) in favor of the Plaintiff on the Defendant's Counterclaim.

---

16. One Circuit Court of Appeals has gone so far as to rule that a technical conversion of property, even where attended by "knowledge that legal rights are being violated", absent additional "aggravated circumstances", is not necessarily "malicious" within the meaning of Section 523(a)(6). *In re Long,* 774 F.2d 875, 881 (8th Cir.1985).

17. In 1994 this statute was codified as C.G.S. § 36a–290(a) and rewritten without change material to this proceeding.