In re Gary Richard **FIRER,** Debtor.

**June Maciolek, Conservator of the Estate of Anna Firer, Plaintiff,**

**v.**

**Gary Richard Firer, Defendant.**

**Bankruptcy No. 02–34661.**

**Adversary No. 02–3162.**

United States Bankruptcy Court, D. Connecticut.

Nov. 24, 2004.

Thomas L. Kanasky, Jr., Esq., Bridgeport, CT, for Plaintiff.

Kenneth E. Lenz, Esq., The Lenz Law Firm, L.L.C., Orange, CT, for Defendant.

**MEMORANDUM OF DECISION ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**

ALBERT S. DABROWSKI, Chief Judge.

## I. INTRODUCTION

At issue in this adversary proceeding is the existence and dischargeability of debts owed to the estate of Anna Firer by the Debtor–Defendant as a result of his alleged fiduciary defalcation while acting as a conservator. For the reasons which follow, the Court determines that the Debtor's depletion of certain funds of the probate estate of Anna Firer created a debt which is non-dischargeable in this bankruptcy case.

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this proceeding on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(I).

## III. FACTUAL BACKGROUND

This proceeding is before the Court for decision after trial. The Court's findings of fact are derived from the evidentiary record at trial and the Court's independent examination and noticing of the official record of the instant case and adversary proceeding. The following facts are undisputed or specifically found by the Court.

1. Gary Richard Firer (hereafter, the "Debtor") is the nephew of Anna Firer (hereafter, "Anna"), an incapable person, who has lived since 1999 under the care of the Lord Chamberlain Nursing and Rehabilitation Center in Stratford, Connecticut (hereafter, "Lord Chamberlain").

2. The Plaintiff, June Maciolek (hereafter, "June" or the "Plaintiff"), is the sister of the Debtor and a niece of Anna.

3. The Debtor describes himself as a cabinet maker. He also acknowledges that he gambles "professionally".

4. The extended Firer family has a long history of asset pooling, and employment of other strategies, calculated to avoid the necessity of probating of wills.

Part of this strategy was executed through the joint titling of deposit accounts between, *inter alia*, Anna and her siblings, and most recently, the Debtor.

5. Prior to the relevant proceedings in the Probate Court, as described hereafter, the Debtor was the principal care-giver for Anna, as well as for other aged relatives. In that connection, the Debtor was Anna's attorney-in-fact by virtue of a power of attorney executed by her. Because this power of attorney was not introduced into evidence, it is impossible for the Court to determine the scope of the authority granted thereby.

6. In early 2000, June applied to the Court of Probate, District of Stratford, State of Connecticut (hereafter, the "Probate Court") to declare Anna incapable, and to be appointed conservator of her person and estate. In response to this action the Debtor consulted with an attorney, and eventually filed with the Probate Court an *Application for Appointment of a Conservator* (hereafter, the "Application"). In the Application, the Debtor represented, *inter alia*, that Anna "suffers from dementia", "is not able to make any medical or financial decisions", and "has property rights which will be wasted, or dissipated unless proper management is provided". The Debtor also stated in the Application that if appointed conservator, he would "accept said position of trust."

7. On April 10, 2000, the Probate Court determined Anna an incapable person and appointed the Debtor as her conservator.

**The Assets of the Probate Estate.**

8. Shortly after the Debtor's appointment as conservator, the Probate Court issued an *Authorization and Agreement Re Restriction on Assets* (hereafter, the "Restrictions") applicable to accounts at Peoples Bank and Fleet Bank. The Restrictions, *inter alia*, precluded withdrawals from those accounts except by decree of the Probate Court, and were consented to in writing by the Debtor.

9. On May 17, 2000, with the assistance and advice of counsel, the Debtor filed with the Probate Court a *Regular Inventory* listing probate estate assets totaling $460,820.41 particularized by him as follows:

| | | |
|---|---:|---:|
| *Bank Accounts* | | $425,438.41 |
|     Fleet Bank | $125,597.54 | |
|     People's Bank | 157,882.66 | |
|     Chase Manhattan Bank [1] | 135,719.46 | |
|     Atena [sic] | 6,238.75 | |
| *Stock* | | 35,190.00 |
| *Lord Chamberlain Personal Funds Account* | | 192.00 |
| TOTAL | | $460,820.41 |

**The Stock.**

10. The "Stock" referenced in the Inventory consisted of 612 shares of E.I. Dupont De Nemours & Co., Inc. (hereafter, "Dupont") stock, held in Anna's name alone. These equity securities were sold by the Debtor as conservator on or about March 28, 2001, yielding proceeds of $24,896.30 (hereafter, the "Stock Sale"), which were wire-transferred into the HUB Account, described below.

**The Fleet Bank Accounts.**

11. The Fleet Bank accounts referenced in the Inventory consisted of six

---

1. The Inventory noted that "[t]his account receives a monthly deposit of $752.27 Social Security (Direct Deposit)".

certificates of deposit, a small savings account, and a small, relatively inactive checking account (hereafter, the "Fleet Bank Accounts"). Each of the Fleet Bank Accounts were jointly titled as "Anna Firer or Gary R. Firer".[2] The actual aggregate balance of these accounts at the time of the creation of the conservatorship was $126,095.46. During the Debtor's tenure as conservator the Fleet Bank Accounts earned an aggregate of $10,224.10 in interest. At the time of the Debtor's removal as conservator, the then-remaining Fleet Bank Accounts had an aggregate balance of $39,390.10.

12. By letter received by the Probate Court on May 25, 2002, the Debtor's attorney requested release of the Restrictions with respect to four of the Fleet Bank accounts (totaling $90,416.97), representing that those funds were needed "in order for the conservator to pay expenses for the ward [Anna]" and that they would be "used to pay Lord Chamberlain, doctor's bills, pharmacy bills, and other expenses for the year 2002." Pursuant to that request the Probate Court removed the Restrictions as to three Fleet Bank accounts totaling approximately $63,000.00.

13. It appears that $96,809.11 was removed by the Debtor from the Fleet Accounts during his tenure as conservator. It is possible, but not demonstrated sufficiently to enable the Court to find, that some portion of these funds were deposited into one or more of the Chase Accounts, as hereafter identified.

**The Peoples Bank Accounts.**

14. The Peoples Bank accounts referenced in the Inventory consisted of six certificates of deposit (hereafter, the "Peoples Bank Accounts") which, at all relevant times, were titled as follows: "Anna Firer in trust for Gary R. Firer". These accounts had an actual aggregate balance of $158,936.29 at the time of the creation of the conservatorship. During the Debtor's tenure as conservator, the Peoples Bank Accounts earned an aggregate of $17,264.98 in interest. At the time of the Debtor's removal as conservator, the then-remaining Peoples Bank Accounts had an aggregate balance of $102,113.40.

15. By letter received in the Probate Court on November 8, 2001, the Debtor's attorney requested the release of the Restrictions with respect to four of the Peoples Bank accounts (totaling $73,297.00), representing that those funds were needed "in order for the conservator to pay expenses for the ward [Anna]". Pursuant to that request the Probate Court removed the Restrictions as to those accounts.

16. It appears that $74,087.87 was removed by the Debtor from the Peoples Bank Accounts during the Debtor's tenure as conservator. It is possible, but not demonstrated at trial sufficiently to enable the Court to find, that some portion of these funds were deposited into one or more of the Chase Accounts, as hereafter identified.

**The Chase Manhattan Bank Accounts.**

17. The Chase Manhattan Bank accounts referenced in the Inventory consisted of a savings account (# 552–6036017–01) (hereafter the "Chase Savings Account") and an active checking account (# 605–1033022) (hereafter the "Chase Checking Account"). During the conservatorship the Debtor opened an additional, relatively short-lived checking account at Chase Manhattan Bank (# 526–0016752–65) (hereafter the "Chase Conservatorship

---

**2.** In addition, during the Debtor's tenure as conservator, the Debtor established a checking account at Fleet Bank in his name alone.

During its life this account received deposits totaling $17,009.51.

Account"). The Chase Checking, Savings, and Conservatorship Accounts are hereafter collectively referred to as the "Chase Accounts". These accounts were titled as follows: (i) the Chase Savings Account and the Chase Checking Account—"Anna Firer";[3] and (ii) the Chase Conservatorship Account—"Estate of Anna Firer, Gary Firer Conservator". The Chase Accounts served, *inter alia,* as the principal vehicles for the Debtor's expenditures on behalf of Anna during the Debtor's tenure as conservator.

18. The Chase Savings Account had a balance of $133,651.24 at the time of the Debtor's appointment as conservator. During the Debtor's tenure as conservator that account received (i) interest earnings of $3,757.14, and (ii) general, largely unidentifiable,[4] deposits totaling $88,214.90. As of the time of the Debtor's removal as conservator, this account had been fully depleted and closed.

19. The Chase Checking Account had a balance of $2,674.54 at the time of the Debtor's appointment as conservator. During the Debtor's tenure as conservator, that account received (i) interest earnings of $84.30; (ii) Social Security deposits of $22,390.00 (hereafter, the "Social Security Deposits"); and (iii) general, largely unidentifiable,[5] deposits totaling $31,831.10.

At the time of the Debtor's removal as conservator, this account had a balance of $54.70.

20. During the period April 2002 through the time of the Debtor's removal as conservator, he admits to making monthly withdrawals from the Chase Checking Account at times and in amounts roughly correlating to the Social Security Deposits into that account. The funds so withdrawn were used by the Debtor for his own benefit.

21. The Chase Conservatorship Account was opened by the Debtor on or about November 21, 2001.[6] During the Debtor's tenure as conservator, that account received (i) interest earnings of $6.51, and (ii) general, largely unidentifiable,[7] deposits totaling $119,498.70. At the time of the Debtor's removal as conservator, this account had a balance of $3.91.

**The Hudson United Bank Account.**

22. In addition to the assets disclosed in the Inventory, Anna had an ownership interest in a bank account at Hudson United Bank. That account (hereafter, the "HUB Account") was titled as follows: "Anna Firer/Gary R. Firer POA".[8] The approximate balance of the HUB Account at the time of the creation of the conservatorship was $87,262.00. The Debtor claims

---

3. As late as October 1999, these accounts may have been titled in the following manner: "Anna Firer/ George Firer". George Firer—Anna's brother—was deceased before the commencement of the conservatorship. Therefore, due to survivorship and apparent re-titling, these accounts were owned exclusively by Anna and/or her probate estate in the relevant period.

4. A deposit of $44,560.19 is identifiable as a distribution to the Debtor from his mother's decedent estate.

5. The sum of $17,000.00 *appears* to be identifiable as three transfers from the Chase Savings Account.

6. This is the same date on which the Chase Savings Account was closed. It appears that the Debtor made a conscious decision to transfer the banking activity intended for the Chase Savings Account to the Conservatorship Account.

7. A deposit of $21,782.30 *appears* to be identifiable as the proceeds of a matured Peoples Bank certificate of deposit.

8. The record established that "POA" stands for "Power of Attorney".

not to have learned of the existence of the HUB Account until October 2000, after his appointment as conservator.[9] Despite the acquisition of this knowledge, the Debtor did not file a supplemental or substitute Inventory with the Probate Court.

23. During the Debtor's tenure as conservator, the HUB Account received (i) interest earnings of $1,372.73 and (ii) a deposit of the proceeds of the Stock Sale in the amount of $24,896.30. The HUB Account was depleted by the Debtor between October 17, 2000 and July 24, 2001, for his own benefit. There was no evidence adduced linking the use of these funds to the care and maintenance of Anna or her estate.

**Other Probate Estate Assets.**

24. In addition to the assets disclosed in the Inventory, Anna had a right to receive a monthly pension payment from Dupont. Anna received these monthly checks by mail at her residence. During the Debtor's tenure as conservator, these checks (hereafter, the "Pension Checks") totaled at least $22,157.08. The Debtor admits that he took receipt of the Pension Checks, cashed them, and used them for his own benefit.

25. In addition to the assets disclosed in the Inventory, Anna had an ownership interest in an insurance policy with Met-Life Insurance Company (hereafter, "Met-Life"). The $942.00 cash surrender value of that policy was paid by MetLife to the order of "Anna Firer" on July 30, 2002. The evidence in this proceeding does not reveal that these funds were deposited into a bank account.

26. The "Atena [sic]" account referenced in the Inventory (hereafter, the "Aetna Account") was not the subject of any definitive evidence in this proceeding. The Plaintiff testified that she could not locate any information on this account. The Debtor testified that this account had a balance of $6,280.00, which he either (i) used to purchase prepaid funeral arrangements, or (ii) deposited into one of the Chase Accounts. In fact, the prepaid funeral arrangements were paid for by a $7,000.00 check drawn on the Chase Checking Account.

27. The "Lord Chamberlain Personal Funds Account" referenced in the Inventory was not the subject of any additional evidence in this proceeding. The Court presumes these to be petty funds on deposit with Lord Chamberlain, and available to Anna for personal, discretionary expenditures.

**The Debtor's Performance as Conservator.**

28. Through March of 2002, the Debtor generally paid Anna's necessary expenses when due from her probate estate property. The Debtor has documented expenditures/disbursements for the care of Anna of $205,900.77 in the period he served as conservator (hereafter, the "Fiduciary Expenditures"). As best as can be determined from the somewhat opaque banking record established at trial, nearly all of the funds utilized for these expenditures were derived from the Chase Accounts, either by check or cash withdrawal.

29. Commencing on or about April 2002, the Debtor failed to make monthly payments (approximately $7,000.00 per month) due to Lord Chamberlain. On August 30, 2002, as a result of the Debtor's

9. The Debtor claims that Anna told him to use the theretofore unknown HUB Account in response to him informing her about restrictions on his use of the Fleet and/or Peoples Accounts. For reasons discussed in Section IV.B.8. of this Memorandum of Decision, it is unnecessary for this Court to determine whether the Debtor's testimony in this regard is credible.

non-payment of Lord Chamberlain obligations, *inter alia,* the Probate Court removed him as conservator and appointed June as "Successor Conservator of the Estate and Person [of Anna]".[10]

30. On September 12, 2002, June, as Successor Conservator, filed with the Probate Court a Substitute Inventory listing bank accounts containing funds particularized by her as follows:

| | |
|---|---:|
| People's Bank [2 Accounts] | $101,609.02 |
| Fleet Bank [5 Accounts] | 39,500.87 |
| Chase Bank [2 Accounts] | 19.16 |
| TOTAL | $141,129.05 |

**The Present Proceedings.**

31. On September 26, 2002, the Debtor commenced the instant Chapter 7 case in this Court. On December 1, 2002, the Plaintiff commenced the instant adversary proceeding against the Debtor. The trial of this adversary proceeding commenced on September 29, was continued to October 27, and concluded with the completion of oral arguments on October 29, 2003. There was no pre or post-trial briefing in this adversary proceeding.

## IV.  DISCUSSION

■ The Plaintiff asserts that the Debtor failed to honor certain fiduciary duties with which he was entrusted when appointed conservator of Anna's estate. Specifically, it is averred that the Debtor used for his own benefit, or otherwise permitted the loss of Anna's assets, including, but not limited to, those included in the Inventory. It is further claimed that these losses created a debt owing from the Debtor to Anna's probate estate, and that such debt is non-dischargeable in the Debtor's pending bankruptcy case.

## A.  Applicable Legal Standards.

■ Congress has determined that under limited circumstances, creditors' interests in recouping certain classes of debts outweigh a debtor's interest in the unqualified "fresh start" implied by a general bankruptcy discharge. *See Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to discharge are, however, to be narrowly construed in favor of the debtor. *E.g., Nat'l Union Fire Ins. Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio),* 91 F.3d 296, 300 (2d Cir.1996).

■ Under the specific terms of Bankruptcy Code Section 523(a)(4), a debt is excepted from a debtor's general discharge if such debt is "for fraud or *defalcation* while acting in a *fiduciary capacity,* embezzlement, or larceny" (emphasis supplied). An objecting creditor bears the ultimate burden of persuading the Court on the elements of non-dischargeability under Section 523(a)(4) by a preponderance of the evidence. *See Grogan,* 498 U.S. at 291, 111 S.Ct. 654. However, once a creditor has demonstrated a loss of assets under a fiduciary's care, the burden of production shifts to the fiduciary to demonstrate that such losses were *not* incurred as a result of his defalcation. *See, e.g., Otto v. Niles (In re Niles),* 106 F.3d 1456, 1460–62 (9th Cir.1997); *cf. Murphy v. Wakelee,* 247 Conn. 396, 405–6, 721 A.2d 1181, 1186 (1998) (when a " 'confidential relationship is shown, together with suspicious circumstances' . . . the burden shifts to the fiduciary to prove fair dealing." (*quoting* 25 Am.Jur.2d 551, Duress and Undue Influence § 38 (1996))).

The Plaintiff has limited the scope of her claim to an allegation of *defalcation* while

10. Following her appointment as Successor Conservator, June paid from the probate estate assets approximately $35,000.00 in un-

paid estate bills accruing since April, 2002. The majority of these payments went to Lord Chamberlain.

the Debtor was acting in a fiduciary capacity, *i.e.* as conservator. Thus the Court need not consider the other conduct elements of Section 523(a)(4), *i.e.* fraud, embezzlement or larceny.

■ It is undisputed and indisputable that the Debtor, as court-appointed conservator for Anna's probate estate, was acting at all relevant times in a "fiduciary capacity" with respect to Anna's property. Nor is there any serious dispute that a fiduciary's use of the fiduciary estate's funds for other than estate purposes constitutes a "defalcation" within the meaning of Section 523(a)(4).

■ A determination of "defalcation" is ultimately a question of federal law. *E.g., The Andy Warhol Foundation for Visual Arts. v. Hayes (In re Hayes),* 183 F.3d 162, 166 (2d Cir.1999). Neither the Bankruptcy Code nor its legislative history defines "defalcation". Plainly though, the term implies at least a failure to maintain the subject trust. The more challenging question is what level of fiduciary *mens rea* must attend that failure. Certainly, a defalcation may be found under circumstances demonstrating less than criminal or fraudulent intention. This conclusion springs directly from the process of statutory construction, perhaps most eloquently summarized by Judge Learned Hand under the Bankruptcy Act, to wit:

> Colloquially perhaps the word, 'defalcation,' ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts .... Whatever was the original meaning of 'defalcation,' it must have covered other defaults than deliberate malversations, else it added nothing to the words, 'fraud or embezzlement.'

*Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 511 (2d Cir.1937).

Indeed it is a fair question whether a defalcation under Section 523(a)(4) requires any mal-intent or misconduct at all. However, this Court need not struggle with that question since there is ample evidence in the record of this proceeding to establish the Debtor's "misconduct"—to the extent that the Debtor used funds for his personal benefit that were owned exclusively by Anna, he engaged in conduct which he knew, or should have known, was not proper.

## B. Analysis of the Debtor's Defenses.

Against this legal background, the Debtor's general response to the Plaintiff's allegations is that it was permissible for him to utilize certain of the subject funds for his own benefit because he had property rights in them which were not eclipsed by his fiduciary duties with respect to Anna's property interests. Thus, a threshold issue in this proceeding is the extent to which the funds in question in fact belonged to Anna—and therefore formed a part of her probate estate—or rather, were funds in which the Debtor had an ownership interest which enabled him to use them for his own benefit.

Because the Debtor purportedly holds different property interests in each of the subject assets, it is necessary for the Court to separately analyze each probate estate asset in order to accurately assess the Debtor's duties and defalcation, if any, with respect to that property component.

### 1. *The Stock.*

These equity securities were admitted by the Debtor to be titled in the name of Anna alone; and he has made no claim to any rights in them. Thus, the Stock was an undisputed part of Anna's probate estate, and properly subject to the Debtor's fiduciary control as conservator. Because of the Stock Sale, and the Debtor's subse-

quent deposit of the proceeds into the HUB account,[11] the Court's conclusion with respect to the propriety of the Debtor's ultimate disposition of the value of the Stock is more properly considered in connection with the Court's analysis of the HUB account, *infra.*

### 2. *The Lord Chamberlain Personal Funds Account.*

The trial record reveals nothing concerning this account other than the Debtor's inclusion of it as a component in the Inventory. It was scheduled there at $192.00, yet the nature of Anna's and/or the Debtor's ownership interest(s) therein was not disclosed. Nor was there any information in the record concerning the Debtor's use, if any, of these funds. The Court presumes these to be petty funds on deposit with Lord Chamberlain, and available to Anna *alone* for personal, discretionary expenditures. Thus, there is no basis for the Court to conclude that the Debtor was guilty of defalcation concerning these funds.

### 3. *The Pension Checks.*

■ The Debtor admits that he took receipt of the Pension Checks, cashed them, and used them for his own benefit. The Debtor's only justification for this conduct was his claim that he "had to" access those funds for his own survival. Thus, there is a basis for this Court to conclude that the Debtor was guilty of defalcation concerning these funds, having a value of $22,157.08.

### 4. *The MetLife Insurance Policy.*

■ As noted above, the $942.00 cash surrender value of an insurance policy was paid by MetLife to the order of "Anna Firer" on July 30, 2002. There is no record evidence that the Debtor used these proceeds directly for Anna's care; nor is there an identifiable record of deposit of these proceeds into any of the Chase Accounts, or any other probate estate deposit account. Thus, there is a basis for this Court to find and conclude that the Debtor used the MetLife policy proceeds for his own benefit.

### 5. *The Aetna Account.*

■ The Court received scant evidence concerning this account. The Debtor testified that the account had a balance of $6,280.00, which he either (i) used to purchase prepaid funeral arrangements, or (ii) deposited into one of the Chase Accounts. However, the Debtor's testimony in this regard is not credible. In fact, the prepaid funeral arrangements were paid with a $7,000.00 check drawn on the Chase Checking Account, and there is no identifiable record of deposit of the Aetna Account proceeds into one of the Chase Accounts. Thus, there is a basis for this Court to find and conclude that the Debtor used the proceeds of this account in a manner other than his testimony indicated.

### 6. *The Fleet Bank Accounts.*

■ At the time of the Debtor's appointment as conservator, the Fleet Bank accounts were jointly titled as "Anna Firer or Gary R. Firer". Under Connecticut law, it is well established that each holder of a jointly-titled bank account is deemed to be an owner of the entire account, and any one of them may withdraw the entire balance. C.G.S. § 36a–290; *see Ardito v. Olinger,* 65 Conn.App. 295, 297–8, 782 A.2d

---

**11.** The evidence indicates that the value of the Stock declined by $10,274.00 between the time of the Debtor's appointment as conservator and the time of the Stock Sale. There is no claim, and no evidence to support, that this depreciation was caused by anything other than market forces.

698, 700 (Conn.App.2001); *King v. King (In re King)*, 214 B.R. 69, 83 (Bankr. D.Conn.1997); *see U.S. v. First Bank*, 586 F.Supp. 174 (D.Conn.1983) (interpreting predecessor, C.G.S. § 36–3); *Masotti v. Bristol Savings Bank*, 43 Conn.Supp. 360, 364, 653 A.2d 836 (1994), *aff'd.* 232 Conn. 172, 653 A.2d 179 (1995) (interpreting predecessor, C.G.S. § 36–3). Accordingly, the titling of the Fleet Bank accounts presumptively accorded the Debtor rights in those accounts equal to Anna's; [12] and it is indisputable that in the pre-conservation period the Debtor could have depleted those accounts for his personal benefit without running afoul of Section 523(a)(4).[13]

■ Consequently, the only debatable question respecting the Debtor's rights in the Fleet Bank Accounts is whether, and to what extent, the Debtor's appointment as Anna's conservator, and/or actions taken by him in that role, altered his pre-existing power to utilize those funds for his exclusive benefit. That question highlights the intriguing legal circumstance of a direct conflict between a fiduciary's responsibilities and his own property rights. In this regard the Plaintiff has failed to direct the Court to any authority holding that a conservator or other fiduciary necessarily forfeits his own property rights as an incident of his assumption of fiduciary duties with respect to the corpus of a probate estate. The only Connecticut judicial decision which appears to have implications for the question at hand is the opinion by Connecticut Superior Court Judge Hodgson in *Soucy v. Haines*, 2000 WL 966154 (Conn.Super. June 20, 2000). In that opinion, the court determined that

the assumption of conservatorship duties by one deposit account joint tenant for the other joint tenant did not alter their pre-existing property rights in the jointly-held account. *See id.*, at *3. Similarly, this Court concludes as a matter of law that the Debtor's appointment as conservator did not effect a forfeiture of any of his rights in property held jointly with his ward prior to the conservatorship.

■ Nonetheless, the Plaintiff would argue that even if the Debtor did not lose his property rights in the Fleet Accounts as an incident of his *appointment* as Anna's conservator, he did suffer such loss by virtue of his *conduct* as conservator. Specifically, the Plaintiff asserts that the Debtor's voluntary inclusion of the Fleet Bank Accounts in the Inventory converted them into the exclusive property of Anna's probate estate. Neither the law nor the evidentiary record support this theory. The Plaintiff has cited the Court to no legal authority that establishes a preclusive effect of a probate Inventory upon persons' rights in the property contained therein. This Court concludes that a Connecticut conservator's inventory, prepared pursuant to C.G.S. § 45a–655(a), primarily serves an information function; it is not capable of altering pre-existing property interests as otherwise determined by probate and other applicable law. This understanding of the purpose and effect of the Inventory also serves the beneficial policy goal of encouraging conservators to err on the side of inclusion when measuring the estates over which they serve as fiduciaries.

Nor has the Plaintiff created a record sufficient to (i) establish a knowing waiver

---

**12.** There was no evidence indicating that Anna, or any other person involved in the titling of these accounts, intended a legal effect other than that otherwise provided under Connecticut law.

**13.** This point was conceded by the Plaintiff during oral argument.

by the Debtor of his interest in the Fleet Bank Accounts, or (ii) estop the Debtor from now asserting such an interest. There was no waiver because the Debtor's testimony indicated that his decisions as to what property to include in the Inventory were wholly informed by the advice of his attorney at the time, and that he now views that advice as faulty. Also, judicial estoppel can not apply here since the claims made now are not inconsistent with any statement of ownership that might be implied from the Inventory. Specifically, the Debtor's present claim to a joint interest in the Fleet Bank Accounts is not incompatible with his inclusion of those accounts in the Inventory since, under the specific terms of C.G.S. § 45a–655(a), a ward's interest in "joint bank accounts" is required to be scheduled in the Inventory.

Accordingly, the Court concludes that with respect to the Fleet Bank Accounts, the Debtor was entitled to use the constituent funds during the conservatorship, unimpeded by the fiduciary duties he assumed as conservator. Thus his conduct with respect to those funds cannot constitute defalcation in a fiduciary capacity.

### 7. *The Peoples Bank Accounts.*

At the time of the Debtor's appointment as conservator, the Peoples Bank Accounts were titled as follows: "Anna Firer in trust for Gary R. Firer". Under Connecticut law, "the beneficiary of an unqualified savings account trust acquires no legal interest in the funds on deposit until the death of the depositor." *Salvio v. Salvio*, 186 Conn. 311, 441 A.2d 190 (1982); *see United States v. State National Bank of Connecticut*, 421 F.2d 519, 520 (2d Cir.1970) ("It is well established that accounts deposited in a bank by the depositor in trust for another are tentative trusts only, revocable at will until the depositor dies or completes the gift in his or her lifetime by some unequivocal act or declaration."); C.G.S. § 36a–296(a)(1) (1996) (unless a "writing specifies to the contrary, it shall be conclusively presumed that the depositor intends to create a trust of all funds credited to the deposit account from time to time upon the following terms: ... (C) if the named beneficiary survives the depositor, the depositor's death shall terminate the trust and title to the deposit account shall thereupon vest in the named beneficiary free and clear of the trust ...."); There is no reason why the rule should be different for the certificates of deposits at issue here, since they too are deposit accounts. *See* C.G.S. §§ 36a–316(4), (18) (1996).

In light of the foregoing, the Court concludes that there was never a vesting of title in the Peoples Bank Accounts' beneficiary—the Debtor—because the depositor—Anna—albeit determined "incapable", remains alive, and there was no credible evidence of an unequivocal act or declaration of her intent to complete a gift, or otherwise transfer ownership rights to those funds, to the Debtor.

This circumstance produces the odd scenario of the Debtor being obligated to exercise, as a conservator, the powers of his own trustee. Certainly the theoretical fact that the Debtor may have been obliged only to act for his own benefit raises interesting questions about the possibility of defalcation, but most certainly does not impugn Anna's ownership interest in the Peoples Bank accounts.

The titling of these accounts suggests that Anna desired to retain ownership of them during her lifetime in order to meet her own needs. If her intention was otherwise, she possessed the demonstrated ability to title these accounts jointly, as she had done with the Fleet Bank Accounts. Thus, although he was the ultimate intended beneficiary, the Debtor was obligated

as conservator to utilize those funds for Anna's needs during her life span. Accordingly, the Debtor never had an ownership interest in the Peoples Bank Accounts, and he was duty-bound to handle those funds in a manner which benefited Anna alone.

The Court is unable to reach a conclusion based on the evidence adduced at trial as to the specific use made by the Debtor of each dollar of the $74,087.87 withdrawn from the Peoples Bank Accounts during the Debtor's tenure as conservator. While there is a suggestion in the record that these funds were deposited into one or more of the Chase Accounts, the Court is unable, after an exhaustive review and analysis of the bank records in evidence, to determine what use was made of such funds.[14]

### 8. *The HUB Account.*

■ At the time of the Debtor's appointment as conservator the HUB Account was titled as follows: "Anna Firer/Gary R. Firer POA". The titling of this account reveals that the Debtor's relationship to, and interest in, that account was, at most, as attorney-in-fact for the benefit of Anna. Thus at all relevant times Anna enjoyed an exclusive interest in the HUB Account. While it is apparent that Anna intended to allow the Debtor to exercise her interest on her behalf pursuant to a power of attorney, at no time did Anna actually cede her ownership interest to the Debtor.

■ Prior to the establishment of the conservator-ward relationship, the Debtor could have utilized the HUB Account for his own benefit *if* Anna instructed or permitted him to do so as her attorney-in-fact.

However, this observation is of little significance because once a conservatorship is created, given the ward's incapacity, the conservator must exercise fiduciary discretion in the ward's best interest, regardless of any specific direction from the ward pursuant to a power of attorney or otherwise.[15] In essence the role of conservator overrides and necessarily supplants the role of attorney-in-fact. *See* C.G.S. § 1–56b (1990) ("If a conservator of the estate of the principal is appointed, the power of attorney shall cease at the time of the appointment . . . .").

The evidence shows that in the relevant time-frame the Debtor depleted the HUB Account of $113,639.11 for his own benefit. Any claim of the Debtor to innocent use of the HUB Account funds, based upon a mistaken belief that the power-of-attorney and Anna's instruction permitted him to do so, is further undermined by his deposit into this account, and subsequent use, of the proceeds of the sale of the Stock—an asset which he knew to be the exclusive property of Anna.

### 9. *The Chase Accounts.*

■ The Chase Accounts appear to have served as the principal vehicles for the Debtor's expenditures on behalf of Anna. Still, the Court is unable to reach a conclusion based on the evidence adduced at trial as to the specific use made by the Debtor of each dollar withdrawn from the Chase Accounts during his tenure as conservator. Certainly the lion's share of the Debtor's $205,900.77 in documented Fiduciary Expenditures were funded directly from the Chase Accounts, either through checks or cash withdrawals. Nonetheless,

---

**14.** A deposit of $21,782.30 *appears* to be identifiable as the proceeds of a matured Peoples Bank certificate of deposit.

**15.** The Debtor himself certified to the Probate Court that, *inter alia,* Anna was "not able to make . . . financial decisions".

a total of $402,049.82 was depleted from these accounts during the Debtor's tenure as conservator.[16] However, this latter figure does not accurately inform a determination of the extent of the Debtor's defalcation because certain of the deposits into the Chase Accounts should not be counted against the Debtor.

As noted above, the Debtor's distribution from his mother's decedent estate was deposited by him into the Chase Savings Account. Certainly the Debtor was entitled to use those funds for his own benefit. Likewise, given this Court's conclusions regarding the Debtor's rights in the Fleet Bank Accounts, any funds deposited from those accounts into the Chase Accounts were legitimately available to the Debtor for his own use. Deposits into the Chase Accounts from the Peoples Bank Accounts also should not be held against the Debtor because all of the withdrawals from the Peoples Bank Accounts have already been accounted for as depleted, *see* Section IV. B.7. of this Memorandum of Decision, and thus should not be "double-counted" in this Section. By contrast though, the Debtor should be held responsible for the Social Security deposits into the Chase Checking Account, since those funds ($22,390.00) were not the Debtor's property nor accounted for elsewhere in this Memorandum of Decision.

■ The difficulty in the foregoing analysis is the Court's inability to trace accurately funds flowing out from the Peoples and Fleet Bank Accounts. Only one deposit into the Chase Accounts— $21,782.30 into the Chase Conservatorship Account—seems to match up temporally and numerically with a withdrawal from the Peoples Bank Accounts (*i.e.* a matured certificate of deposit); and no deposits into the Chase Accounts cleanly correspond to any withdrawal from the Fleet Bank Accounts. To navigate around this area of ambiguity, and enable an equitable judgment in this proceeding, the Court resorts to a presumption which is ultimately informed by jurisprudential concerns. Namely, given the bankruptcy law's "benefit of a doubt" in favor of debtors in dischargeability litigation, this Court will ignore all deposits into the Chase Accounts during the tenure of the Debtor as conservator, with the sole exception of the Social Security Deposits. In essence the Court is presuming, in the absence of proof to the contrary, that all of the non-Social Security deposits into the Chase Accounts came from either (i) the Debtor's own funds (*e.g.*, Fleet Bank Accounts), or (ii) funds already counted against the Debtor in previous Sections of this Memorandum of Decision (*e.g.*, Peoples Bank Accounts).

Accordingly, this Court concludes that the Debtor was responsible for $162,505.12 in *net* probate estate depletion from the Chase Accounts. This sum is derived by subtracting $239,544.70 in exempted deposits [17] from $402,049.82 in *gross* depletion from the Chase Accounts.

## C. Summary and Calculus of Non–Dischargeable Debt.

In light of the foregoing Discussion, the extent of the Debtor's defalcation as conservator is determined by totaling the depletion of probate estate property from its various asset components as heretofore found and concluded, and subtracting from

---

16. The depletion was comprised of the following components: Chase Savings Account— $225,623.28; Chase Checking Account— $56,925.24; and Chase Conservatorship Account—$119,501.30.

17. Comprised of $88,214.90 (Chase Savings Account deposits) + $31,831.10 (Chase Checking Account deposits) + $119,498.70 (Chase Conservatorship Account deposits).

that total the documented Fiduciary Expenditures made by the Debtor, to wit—

DEPLETED ASSET COMPONENTS

| | |
|---|---|
| Pension Checks | $ 22,157.08 |
| MetLife Policy Proceeds | 942.00 |
| Aetna Account | 6,280.00 |
| HUB Account | 113,639.11 |
| Peoples Bank Accounts | 74,087.87 |
| Chase Bank Accounts | 162,505.12 |
| | |
| TOTAL | 379,611.18 |
| Documented Fiduciary Expenditures | (205,900.77) |
| TOTAL DEFALCATION | 173,710.41 |

## V. CONCLUSION

For the foregoing reasons judgment shall enter in favor of the Plaintiff declaring a debt owing to the Estate of Anna Firer in the amount of $173,710.41, which is non-dischargeable in the Debtor's bankruptcy case pursuant to Bankruptcy Code Section 523(a)(4).

### JUDGMENT

This adversary proceeding having come on for trial; and the Court having this day entered its *Memorandum of Decision on Complaint to Determine Dischargeability of Debt* (hereafter, "Memorandum of Decision"), in accordance with which it is

**ORDERED AND DECLARED** that there exists a debt owing from the Debtor–Defendant to the Estate of Anna Firer in the amount of **$173,710.41**, which debt is **NON–DISCHARGEABLE** in the Debtor's bankruptcy case pursuant to Bankruptcy Code Section 523(a)(4).